**Hercules BARAKIS**

v.

**AMERICAN CYANAMID CO.**

Civ. A. No. 3505.

United States District Court
N. D. Texas,
Fort Worth Division.

April 7, 1958.

Martin, Moore & Tackett, Elvin E. Tackett, Fort Worth, Tex., for plaintiff.

Stone, Agerton, Parker & Kerr, John Kerr, Fort Worth, Tex., for defendant.

ESTES, District Judge.

Plaintiff, Hercules Barakis, a resident of Tarrant County, Texas, filed this suit on January 18, 1957, against American Cyanamid Co., a corporation organized under the laws of the State of Maine, to recover damages in the amount of $44,-943 (modified at pre-trial) for alleged damages to vegetable crops during the years 1955 and 1956 upon three tracts of land, comprising a total of 13.8 acres leased for agricultural purposes from the Tarrant County Water Control and Im-

provement District No. 1, a political subdivision of the State of Texas, organized under Art. 7880–1, Vernon's Ann.Civ.St. Texas. The plaintiff's suit is based upon the alleged pollution of the Trinity River by the defendant, an upstream owner, whose right to put its water into the Trinity River was acknowledged by the plaintiff. The three tracts of land lie adjacent to the Trinity River in the City of Fort Worth, Texas, and are in surveys patented from the State of Texas in 1857, and were acquired by the Water Control District in 1952 by deeds conveying fee simple title.

Plaintiff Barakis leased the three tracts in question by oral agreement, rent free, for the year 1955, and by a written lease for the year 1956 for the amount of $100. Neither of the lease agreements provided for the grant of any rights of irrigation, and plaintiff was informed that the Water District had no authority or responsibility in allowing him to use the water from the Trinity River. The parties stipulated that the 1955 oral contract was the same as the 1956 written agreement, except for the difference in payment of rent. The contract from said Water District to the plaintiff stated:

"You assume any and all risks of whatever kind or character incident to the action of water, whether the same results from the state of nature or from the works being maintained and operated by this District or from any act whatever that may be done by others in carrying out the plans of this District. This, among other things, shall include the assumption by you of any injury or damage which may be occasioned by floating timber, drift wood, silt, or other materials of nature, which may be caused to come to, pass over, or proceed from, to or upon the land in question."

It is the plaintiff's contention that his right to irrigate arises from the fact that he is an agricultural lessee of a riparian owner, and that riparian rights attached to the land and became vested property rights when it was patented from the State of Texas in 1857. Neither the plaintiff nor his lessor had made application under Art. 7492, Vernon's Ann.Civ. St.Texas, to the Board of Water Engineers for a permit to take irrigation water from the Trinity River.

The defendant, American Cyanamid Co.'s plant was built in 1942 by the United States government for the purpose of producing catalyst, used by oil refineries. Immediately after construction, the defendant, under a contract with the government produced the first catalyst in April 1943. The plant has been operated continuously without any substantial deviation in its operations since that date. The defendant in 1948 purchased the plant from the government, and has since operated it substantially as before.

In producing such catalyst it is, and has always been, necessary that the defendant use large quantities of water, which it purchased directly from the City of Fort Worth, the average daily consumption of water since commencement of operation being approximately 1,046,-000 gallons. Such water, after use, is disposed of into the Trinity River at a point above the tracts of land farmed by the plaintiff.

It is contended by the plaintiff that the discharged water contained a high saline content, particularly high in sodium sulphate, so as to render the water in the river downstream from the effluent of defendant unfit and unsuitable for use as irrigation water upon vegetables. It is undisputed that in the years 1955 and 1956 there was a serious drouth in the area, and there was no water being released by the Lake Worth Dam, located upstream from the tracts occupied by both plaintiff and defendant. It is beyond question that during much of the period complained of that substantially all of the water flowing past the tracts leased to plaintiff was the effluent discharge from defendant's plant with some slight drainage from the industrial area of North Fort Worth. There was no substantial natural or ordinary flow of the river.

It is the plaintiff's contention that even though substantially all of the water flowing past his agricultural tracts at certain times was entering said river from defendant's effluent the defendant would still not have the right to create a flow of water down said Trinity River unfit for his irrigation purposes.

 The basic issue before the Court is that of the riparian rights of the plaintiff, inasmuch as the defendant's right to discharge waste water into the river was not disputed. The principles of Motl v. Boyd, 1926, 116 Tex. 82, 286 S.W. 458, and Watkins Land Co. v. Clements, 1905, 98 Tex. 578, 86 S.W. 733, 70 L.R.A. 964 remain the basic law of riparian rights of the State of Texas as announced by the Texas Supreme Court. These principles have been stated by Paul Cunningham, Water Law Conferences 1954, University of Texas, p. 274, to be as follows:

"(a) That title to the waters of the navigable streams is in the State of Texas, to be held in trust for public use; that use being first, for navigation; second, for riparian owners; third, to be controlled and used for the best interest of all the people;

"(b) That lands in original grants, abutting on natural or navigable streams held riparian rights in the natural flow of waters of that stream as part of the title of their lands;

"(c) That riparian ownership would not extend to flood waters;

"(d) That the use of waters by riparian owners must be reasonable, taking into consideration the same right of the other riparian owners above and below them, so that their use must not work any injury to the use by others."

From paragraph (a) above it becomes evident that there is no ownership in either the plaintiff or defendant of the waters of the Trinity River. The riparian had only the right to use the flow of riparian water in a reasonable manner under the circumstances. The water is the property of the public; it is subject matter strongly affected with a public interest, and that such public interest is equal to or superior to any vested property rights of a riparian owner has been urged by A. A. White[1] and Will Wilson[2] in "The Flow and Underflow of Motl v. Boyd", 9 Southwestern Law Journal, 431, 432, by the following statements:

"There is no persuasive authority or practice however, to support the position that he (the riparian owner) had a vested property right to the waters of adjoining streams for irrigation, independent of established and recognized use, superior to that of anyone else who could legally obtain access thereto, or superior to the power of the State to give such access and to regulate the distribution of its public waters as it concluded to be in the public interest.

"That the conclusion of the court in Motl v. Boyd 'That all grantees of public lands became vested, by reason of the lands granted, with riparian rights to the waters of the streams * * * not only for his (their) domestic household use but for irrigation as well' is not only unsupported by the authorities and practices above detailed, but is overwhelmingly refuted by them."

A comparison of the decisions referred to by Mr. White and Mr. Wilson in 9 Southwestern Law Journal 1 and 9 Southwestern Law Journal 377, with the principles of Motl v. Boyd, supra, and Watkins Land Co. v. Clements, supra, indicates the correctness of the following statements of United States District Judge James V. Allred in Martinez v. Maverick County Water Control and Im-

1. A. A. White, Former Dean, University of Houston College of Law.

2. Will Wilson, former Associate Justice, Texas Supreme Court; Attorney General of Texas.

provement District No. 1, 5 Cir., 1955, 219 F.2d 666, 670:

"For years it has been a matter of common knowledge that the Texas water laws and decisions are in hopeless confusion; that even if they are as clear as some attorneys profess to believe them, their application and administration would be difficult for an agency clothed with ample authority; that the present state laws, which have been on the books without change for decades, confer little, if any, real authority upon the State Board of Engineers; that the Board has granted permits on many streams in the state, very few of which have been cancelled, in such numbers and for such quantities, that if riparian rights are given the full effect for which plaintiffs contend, practically every drop of water, normal flow or flood, is 'bespoken' * * * "

That there is such confusion the Court has no doubt, but upon a reading of many of the decisions and the statutes it stands out that the waters of the navigable streams of Texas are owned by the State and must be controlled and used for the best interest of all.

 The Tarrant County Water Control and Improvement District No. 1 acquired any riparian rights which the grantors in their deed to the District might have owned, and the District held these important water rights for the benefit of the public, and under the laws and cases of this State, such rights could not be considered as passing from the Water District, when neither the oral or written leases expressly so provided. By executing a lease to the plaintiff for agricultural purposes, and where the manager of said Water District expressly informed the lessee at the time of executing such leases that no water rights were conveyed, and that said lessee would have to see about getting his own water permits, no vested riparian right to the waters of the Trinity River passed from the lessor to the lessee.

 From paragraph (b) above it is to be noted that riparian rights apply only to the lands in the original grants, abutting on the natural streams in the original surveys. The Barakis tracts, at least in substantial part, are "man made" soil; portions of the tracts did not exist prior to the year 1954. Neither the land nor the river channel are the same today as they were at the time of the patent from the sovereign. The channel of the Trinity River was changed, not by accretion, but by the efforts of the Tarrant County Water Control and Improvement District No. 1. The land conveyed by the deeds to the District could only have been up to the bank of the river, as it was then constituted. If the course of the river had been changed by accretion, which is a slow, gradual building up of the land by the gradual deposit, by the river of a solid material, 44 Tex. Jur. 96, then the boundary lines would have changed with the bank of the river. However, where the change is by avulsion, which is a sudden and perceptible loss or addition to land by the action of water or otherwise, 44 Tex.Jur. 98, then the boundary line remains fixed as originally settled and does not change with the course of the river.

██ ██ Thus, the land built up artificially by the Water District comes under the doctrine of avulsion, and cannot be added to the land as originally constituted, and such change in the channel works no change in the boundary line of the premises. The map, photographs and testimony show that some of plaintiff's agricultural tracts cannot be riparian lands; those "man made" acres along the "man made" river channel, and those acres separated from the artificially constructed channel by the artificially made land, lost their riparian characteristics. There was no vested and no riparian right to irrigate those acres.

The testimony of plaintiff Barakis and Mr. Hickey, General Manager of the Water District, shows that the plaintiff knew that much of this land was built up disturbed soil; that he knew that this was a man-made channel of a river which

had been changed by his lessor. Plaintiff's agricultural lease of this land did not, either expressly or by implication, or as a matter of law, convey to him rights of irrigation.

The evidence clearly shows that the land was not considered productive agricultural land by either lessor or lessee at the time of the lease. The land was rough and partially filled in material from river excavations, and no rent was charged because the plaintiff said "he couldn't produce any crops on the land as it was in the state at that time". It is evident that plaintiff's alleged injuries may have been caused by soil deficiencies rather than polluted water.

■ It is to be noted from paragraph (c) above that riparian ownership would not extend to flood waters. A riparian proprietor may claim the use of only the ordinary and natural flow of the stream. The plaintiff has fairly admitted that "in the summer months that a large portion of the flow of water past plaintiff's tracts had been introduced into the Trinity River by the defendant".

■ The West Fork and the Clear Fork of the Trinity River join above the tracts of land operated by the plaintiff, and the evidence shows that the West Fork of the Trinity River had no water passing over the spillway of the Lake Worth Dam since 1950, and the Benbrook Dam of the Clear Fork of the Trinity River was closed during the month of September 1952 and only such water had been let past that Dam since such date as was permitted by the Government. According to the flow records of the United States Government there was no water flowing by plaintiff's premises on many of the days of the years complained of by him. On many other days, the substantial portion of the flow in the river by plaintiff's tracts was from the defendant's effluent. Since so large a part of the water flowing by plaintiff's tracts was not the natural and ordinary flow of the river, and title to the land leased by the plaintiff was vested in a political subdivision of the State, namely the Tarrant County Water Control and Improvement District No. 1, and the ownership of the water itself was in the state, the control and distribution of such waters should validly be regulated by statute. Art. 7492, Vernon's Ann.Civ.St. Texas is such a statute. This statute the plaintiff was not at liberty to ignore. Statutory regulation of these waters would not be unconstitutional as depriving plaintiff of property without just compensation, nor would they be contrary to McGee Irrigating Ditch Co. v. Hudson, 1893, 85 Tex. 587, 22 S.W. 967; or Barrett v. Metcalfe, 1896, 12 Tex.Civ.App. 247, 33 S.W. 758 (error refused).

From paragraph (d) above it is to be noted that the use of water by a riparian owner must be reasonable, taking into consideration the same rights of the other riparian owners above and below them, so that their use must not work any injury to the use by others. Both plaintiff and defendant, in strong briefs, have urged the doctrine of reasonable use. However, there is a wide difference of opinion as to what constitutes a reasonable use. In the circumstances in this case was it reasonable for the plaintiff to begin taking, for the first time, large quantities of water from the diminished flow of the Trinity River during the unprecedented drouth period of 1955 and 1956? The Court thinks not. Joe Carter of the State Board of Water Engineers of Texas in an article, "The Position of the Board of Water Engineers on the Scope of Riparian Rights", Texas Water Conference 1954, p. 203, University of Texas, and referred to in 33 Texas Law Review 39, quoted from Rule 520.2, Subsection (g) of said Board as follows:

"The riparian owner is subject to the doctrine of reasonable use which limits all rights to the use of water to that quantity reasonably required for beneficial use and prohibits waste or unreasonable use or unreasonable methods of use or diversion. It has been the attitude of the Board that during a period of water shortage or drouth the use of water for irrigation is an unreasonable use. Such a

conclusion is inevitable when 40 years of experience, study, observation and surveys by this Board indicate that downstream humans and animals will suffer during a drouth if extensive upstream irrigation is practiced. Therefore, in determining the amount of water available for appropriation the Board has followed a policy of recognizing that riparian right is limited to the use of state water for only domestic and stock raising purposes."

At the time the early doctrines pertaining to riparian rights were being developed, man's ability to divert waters from streams by means other than gravity flow was exceedingly limited. Today, powerful and efficient pumps have made it physically possible for man to divert all of the anticipated normal flow of most any stream in Texas. As man's ability to divert stream flow has improved, the practice that might have been once reasonable is now unreasonable. Neither is it reasonable to say that the defendant must not discharge his waste water into the stream when it is apparent that this water, which had been purchased by the defendant from the City of Fort Worth, flowing down the Trinity River during the period of drouth was unquestionably better for the plaintiff and for the public in general than no flow of water would have been.

The preponderance of the evidence does not show that the water flowing by the plaintiff's tract was essentially useless for irrigation. The analysis of the content of the Trinity River at the plaintiff's pump site as introduced in evidence by the plaintiff was proximately 1,500 parts per million of sodium. The testimony of Dr. Gray, plaintiff's expert witness from Midwestern University, was to the effect that this content was not so high as to cause him to condemn the water for irrigation purposes on that basis. He condemned the water because its Soluble Sodium Percentage (S.S.P.) was in excess of 60% and he stated that the standard of 60% was obtained by him from the Handbook published by the Riverside California Experimental Station. However, his testimony did not establish that this was an essential standard by which irrigation waters generally might be judged. The testimony of Dr. Edward Stiber established that water of a much higher sodium content and with a much higher S.S.P. was being used successfully, commercially, in the Rio Grande Valley, and also from both the Brazos and Bosque Rivers. Mr. Valentine of the Dalworth Soil Conservation District, a witness for plaintiff, testified that he, in his official capacity, started getting complaints about the irrigation waters of the Trinity River in 1956. For over 12 years the defendant had been discharging its effluent into the river and Mr. Valentine had heard no complaints. His testimony that it was not customary to even test the waters of the Trinity River would indicate that the effluent discharge had not made the waters of the Trinity unsuitable for irrigation.

The testimony of plaintiff's witness, Leonard Lamb, of the Texas Game, Fish and Oyster Commission, made it evident that the Commission was aware of the situation that existed in and along the Trinity River during the period in question. His testimony further showed that the Commission had been diligent in the prosecution of salt water pollution cases. However, it is to be noted that the Commission had taken no action against the defendant for the pollution of the Trinity River. Witness Lamb did not purport to know anything about agricultural pollution, and his testimony cannot be interpreted as authority for the proposition that the waters of the Trinity River were then, or are now, unfit for irrigation.

The uncontroverted fact that plant growth along the banks of the River and down to the edge of the water was dense and luxuriant is evidence that the water of the River had no serious deleterious effect upon plant life generally. Plaintiff Barakis' testimony that he pumped water from the river and onto his land many times without suspecting any detrimental qualities is convincing that the water was no more polluted or contami-

nated or less suited to the ordinary domestic needs, including irrigation, than is the water of most any stream similarly situated in Texas. This is not a case of industry coming in and driving out the farmer, but the reverse.

### Negligence

Plaintiff in his petition charged the defendant as follows:

"The placing of said waters containing a high percentage of soluble salts in the Trinity River by defendant, the natural flow of waters downstream of said river to points adjacent to plaintiff's above described leasehold estate and placing of such polluted and contaminated waters onto said leased land and young growing vegetables of plaintiff caused said land to be saturated with such soluble salts to the extent that said land of plaintiff could not and cannot grow vegetables."

The original complaint and this allegation embrace theories of negligence although it is not so stated.

In support of his claim for damages the plaintiff points to the statement "salt water, which must be disposed of without injury to property or the pollution of streams" in Turner v. Big Lake Oil Co., 128 Tex. 155, 96 S.W.2d 221, 226, but in the Turner case the Supreme Court of Texas held that insofar as damages to private property or bodies of water are concerned there can be no recovery without pleading and proving negligence on the part of the defendant; that liability for the discharge of salt water from oil wells must be predicated upon negligence rather than absolute liability as laid down in Rylands v. Fletcher, L.R. 3 H.L. 330, and decisions resting thereon. There being no proof of negligence on the part of the defendant in the instant case, it is apparent that negligence is no ground for recovery in this case unless it becomes negligence per se because of the alleged violation of Art. 698b of Vernon's Annotated Penal Code of the State of Texas, or the alleged violation of Art. 4444, Vernon's Ann.Civ.St. Texas.

Art. 698b is a part of the Penal Code of this State. The Article appears under the title of "Public Health" and the chapter dealing with "Acts Injurious to Health". The Article is dealing with an act which is a misdemeanor, and public right to be protected. The emergency clause of the Act itself, "to preserve important natural resources of this State, to conserve the public welfare and public health of this State", § 9, establishes that it was not the intent of the legislature to thereby confer rights of action for damages in a case such as this, where the alleged injury was not, and was not alleged to be, an act injurious to health.

Art. 4444 regulates pollution of a public body of water. It is to be noted that the Article expressly states that it shall not apply to "any place or premises of manufacturing plants whose affluents contain no organic matter that will putrefy, or any poisonous compound or any bacteria dangerous to public health or destruction of the fish life of streams or other public bodies of water". In the instant case it is established by the evidence that the defendant was not putting organic matter, bacteria or poisonous compounds into the Trinity River, and Article 4444 is not determinative of rights to the plaintiff nor limitations upon the defendant in this case. The above statutes do not make the actions of the defendant negligence per se as it is clear that the alleged injuries were not of the type that this statute was designed to cover. Leonard Bros. v. Zachary, Tex. Civ.App.1936, 94 S.W.2d 509 illustrates this point. The ordinances of the City of Fort Worth prohibited the discharge of waste water into the streets of the city. Soapy water was discharged by the defendant from its store into the streets, and it was splashed up onto the sidewalks. The plaintiff fell because of its soapy condition on the sidewalk. The court held that the ordinances were designed as sanitary provisions for the benefit of public health, and a violation of the ordinances did not constitute negligence per se as to the plaintiff. 30B Tex.Jur. 295. In the instant case, as in Lynn v. Maag,

5 Cir., 1955, 220 F.2d 703, 706,[3] "the record is devoid of evidence tending to prove actionable negligence on the part of the [defendant]."

## Nuisance

The plaintiff has cited King v. Columbian Carbon Co., 5 Cir., 1945, 152 F.2d 636, 638, for the following definition of the word "nuisance":

"A nuisance, broadly stated, is anything that works an injury, harm, or prejudice to an individual or to the public. According to definitions formulated from numerous decisions, a nuisance will embrace everything that endangers life or health, offends the human senses, transgresses the laws of decency, or obstructs, impairs, or destroys the reasonable, peaceful, and comfortable use of property. Personal and property rights are guaranteed by the organic and statutory law of the land, but liberty, not license, in the use of these rights is the heritage of the American citizen, and coupled with the protection and conservation of rights of persons and property is the mandate, to so use them as to not trample upon, disregard or destroy the rights of others.' Trueheart v. Parker, Tex.Civ.App.1923, 257 S.W. 640.

"At the common law a public nuisance was defined as 'anything that worketh hurt, inconvenience or damage to the subjects of the Crown.'

"A private nuisance is anything done to the hurt or annoyance of the lands, tenements or hereditaments of another; that produces damages to but one or a few persons and cannot be said to be public. 2 Bouvier's Law Dictionary, Rawle's Third Revision, page 2379.

"The terms 'nuisance' and 'negligence' are not synonymous. Liability for negligence is based on want of proper care while one who creates or maintains certain types of nuisances may be liable for resulting injury regardless of the degree of care or skill exercised to avoid injury. The existence of a nuisance does not always depend upon the degree of care used but upon the degree of danger or damage existing even with the best of care. In the case of nuisances not created by negligence, ordinarily the question of care or want of care is not involved. A nuisance may be, and often is, the consequence of negligence. Acts or omissions which constitute negligence may also give rise to a nuisance. Olivas v. El Paso Electric Co., Tex.Civ.App.1931, 38 S.W.2d 165 and Tex.Civ.App.1932, 54 S.W.2d 154."

As Professor William L. Prosser has observed in 20 Texas Law Review 410, such definitions are broad enough to cover all conceivable torts. They do not, however, justify labeling the action of the defendant in the instant case a nuisance in the light of the following statement:

"What is a reasonable use, or whether a particular use is a nuisance, cannot be determined by any fixed general rules but depends upon the facts of each particular case, such as location, character of the neighborhood, the nature of the use, extent and frequency of the injury, and the effect upon the enjoyment of life, health, and property of the plaintiff." 31 Tex.Jur. 424 Sec. 13. King v. Columbian Carbon Co., supra, 152 F.2d at page 642.

In the case of King v. Columbian Carbon Co., supra, the "defendant is continually casting carbon, soot, and greasy distillate upon the plaintiff's lands". In the instant case the defendant cast nothing upon the land of the plaintiff; it was the plaintiff, who, without testing or obtaining water permits, voluntarily

---

**3.** Commented upon by Lee Jones, "Escape of Deleterious Substances; Strict Liability vs. Liability Based Upon Fault".

1 Rocky Mountain Mineral Law Institute 205–207.

and for his own purposes brought the waters of the Trinity River upon his land.

In the cases cited by the plaintiff involving pollution of a stream, well or water course, wherein the court labeled it a nuisance there was always present in the case, "stagnant water", "a malaria pond", "oil", "unpleasant odors", or "a stench". The word "nuisance" implies some menace to health or to the enjoyment of a property right; it does not encompass a situation where a plaintiff voluntarily goes out and brings upon his property a substance such as the water in the instant case, which was in no wise injurious to the life or health or offensive to the senses of the plaintiff.

■ An application of the principles of King v. Columbian Carbon Co., supra, and the pollution cases cited by the plaintiff does not warrant a holding that the defendant has committed a nuisance.

The court in the case of Boyd v. Schreiner, Tex.Civ.App.1909, 116 S.W. 100, 103, stated:

"That is a nuisance which annoys and disturbs one in the possession of his property rendering its ordinary use or occupation physically uncomfortable to him, for which courts of law afford redress by giving damages against the wrongdoer, and, when the cause of annoyance and discomfort are continuous, equity will interfere and restrain it."

This shows very clearly that a wrong, to be properly labeled a nuisance must be annoying to the person in possession of the property, rendering its ordinary use physically uncomfortable to him. The effluent discharge was not shown by the evidence to be injurious to health, obnoxious or offensive to the usual senses and as the plaintiff went out and of his own free will, many times brought upon his land the waters, he cannot prevail upon the theory that the water was not suited to his needs and constituted a nuisance as to him.

## Rights by Prescription

Defendant, American Cyanamid Co., contends that its long, continual open use under a claim of right to do so, was adverse to the plaintiff's lessor, the plaintiff and all other individuals, and that defendant now has a right by prescription to discharge its water into the Trinity River; or at least the plaintiff cannot now complain because any rights he or his lessor may have had are barred by the statute of limitation, or by the laches of plaintiff or his lessor.

■ It is well established that a water right may be lost by prescription. Prescription follows the rule of limitation, and the use of water must be open, notorious, peaceable, exclusive, adverse, and under a claim of right.

"It is not an open question in Texas that an upper riparian proprietor may, by prescription, acquire the right to use the water of a stream, in a special way and in excess of the right arising from ownership of his land, to the injury and detriment of lower riparian proprietors. And the time to perfect such a right by prescription is 10 years." Martin v. Burr, 1921, 111 Tex. 57, 228 S.W. 543, 545.

The rule of prescription in Texas has been further explained by Dean Hildebrand, "Rights of Riparian Owners", 6 Texas Law Review 19:

"To gain this prescriptive right there must be an uninterrupted and continuous use of the water for the whole prescriptive period, which is ten years in Texas by analogy to the statute of limitation. The use must be adverse in the same manner that possession must be adverse in order to gain a limitation title to land. Thus, it must be hostile and under a claim of right. And also, it must be open and notorious so that the owner will be charged with notice, but constructive notice has the same effect as actual notice. A prescriptive right will only be gained as to that

amount of water that is beneficially used during the ten years."

Defendant's plant had been continuously operated in substantially the same manner, with the waste water discharged into the Trinity River, since April 1943. From that date until 1948 the plant was owned by the United States Government and operated by the defendant. In 1948 it was purchased from the government by the defendant.

 It is apparent that plaintiff's lessor, the Tarrant County Water Control and Improvement District No. 1, knew or should have known of the water being discharged into the river. The requirement as to notice was met, but such use by the defendant was not hostile or adverse to plaintiff's lessor from 1943 to 1955 because it is undisputed that there was adequate water in the river to serve all claimants, and no actual damage was suffered to start the running of the period of limitation. The ten-year statute did not begin to run in 1943 because no rights of plaintiff's lessor had been invaded; the defendant had no right by prescription to discharge its water into the river. From the dates of the alleged injuries, and from the date of the filing of this suit, it is apparent that the action was not barred by limitation or laches.

### Act of God

From the evidence, especially plaintiff's flow chart, it is clear that the alleged injuries would not have been suffered by the plaintiff if the Trinity River had continued to flow during the years 1955 and 1956 in its normal volume. The flow statistics show that there was only a small fractional part of the usual water flowing down the Trinity River in the two years involved as compared with a ten year period. The decreased flow was unquestionably due in part to the drouth. Furthermore, due to the drouth, "nature's leaching process" of the soil, which would have removed deleterious substances from the soil did not function in the normal and expected manner.

In conclusion, it is held that the plaintiff has failed to establish by a preponderance of the evidence that defendant has invaded any riparian right vested in plaintiff or that plaintiff has sustained injury or damage caused by negligence, nuisance or defendant's violation of any law conferring upon plaintiff a right of action for the alleged injuries and loss sustained by him.

Accordingly, I find that judgment should be entered in favor of the defendant.

Let the attorneys for the defendant prepare and present a judgment in accordance with this memorandum decision, which is filed in lieu of findings of fact and conclusions of law, pursuant to Rule 52(a), Fed.Rules Civ.Proc., 28 U.S.C.A.