Alexander Del Giorno, J.
The above are claims filed against the State of New York as a result of the appropriation by the State, acting by and through the Commissioner of Mental Hygiene, pursuant to section 46 of the Mental Hygiene Law, of certain real property, buildings and fixtures, situate in th.e Borough of The Bronx, State of New York, for the purpose of *734 erecting thereon a new mental hygiene hospital, more particularly described on the appropriation map and description of land acquired for said project, designated as map No. 1, Kathleen Gottfried and others, which was filed in the office of the Kegister of the City of New York for the County of The Bronx, on the 31st day of August, 1956, at which time title was vested in the State of New York.
It was stipulated that a copy of said map and description was personally served on the claimants.
The various properties as shown on said map are more particularly described in the descriptions attached to the said filed map, and said descriptions are by reference made a part of this decision.
Claimant, Kathleen Gottfried, received from the State, on November 6, 1957, the sum of $1,500,000, pursuant to an agreement for partial payment. The State contends that this payment was to be without interest. The court reads no such waiver of interest in the agreement and, therefore, interest thereupon wall be awarded and made payable as hereinafter indicated.
The separate realty claims demanded the amounts hereunder set alongside of each named claim as their damages:

Claim No. 6, The City of New York, has been settled by written stipulation which will go into effect as soon as governmental technicalities, imposed by law, shall have been complied with. Hence, there shall be no further consideration herein of the said claim.
•As to the remainder of the realty claims, it was agreed that the testimony adduced with reference to realty values in the principal claim, namely, that of Kathleen Gottfried, should be applied by the court, as far as it was applicable, to all the claims, with the further agreement that separate findings and judgments are to be made in each case.
The cases of Kathleen Gottfried, Lark Holding and Frances Miller were all tried by Mr. Monroe Goldwater. However, dur *735 ing the trial, Frances Miller desired to change her attorney. With the consent of all parties, the court permitted her to change attorneys and her case was tried separately and de novo.
The cases of Elsie Jacobs and Jack M. Vincent were tried by other attorneys who agreed by stipulation, however, to accept the land valuations offered in the main case, in the event of a favorable judgment for the claimants Jacobs and Vincent.
The Marway, Inc., claim, one for fixtures, is closely entwined in much of the proof given in the main case. The Marway claim was originally filed by Wasserman and Shagan as attorneys for the claimant. It was for $27,423.49. It had attached to it a minutely detailed schedule of each item claimed and its alleged value. It was prepared by one Frank Ruden who, however, was not called at the trial as a witness.
Mr. Monroe Goldwater was substituted as attorney for the claimant in the Marway claim. He filed an order amending the claim to $40,245. This claim referred to fixtures in buildings “ E ” and “ F ”, and, prior to the trial, had been assigned to Parkway Center, Inc.
In addition thereto, Parkway Center, Inc., which is the personal corporation of Harold Gottfried, husband of the claimant, also took assignments of all other fixture claims of tenants and filed a claim therefor.
Parkway Center, Inc., claim Ho. 35478, was for fixtures in building “ A ” for $90,515.
Parkway Center, Inc., claim Ho. 35298, was for fixtures in buildings “ B ”, “ C ”, “ D ”, “ G ”, “ I ” and “ J ” for a total of $72,150.
All the afore-mentioned parcels of land form the entire taking by the State. These parcels are contiguous and may be compared in shape to one’s left index finger. That part of the finger which joins the hand, or the southerly part, adjoins the Hew York Rapid Transit Westchester Avenue yards at Westchester Avenue.
The inner part of the finger, or the westerly side, is generally parallel to the course of the Hew York, Hew Haven and Hartford Railroad Company tracks; the tip of the finger runs generally along the south line of the Bronx Pelham Parkway and the outside of the finger, or easterly line, runs along the westerly side of the Hutchinson River Parkway Extension down to the Westchester Avenue exit of the parkway.
The court believes that a general discussion of the Kathleen Gottfried case will lead to an understanding of the basic factors affecting the awards of damages in all the other cases, including *736 that of Frances Miller which,- however, shall also be discussed on its own independent merits.
In the case of Gottfried, the parties stipulated that the land involved consisted of 88.310 acres, exclusive of 7.112 acres which was land in the bed of Westchester Creek and Stoney Creek, both of which were filled in before the appropriation herein. When they were filled in was not proven.
The State claimed ownership of this creek land on the ground that it was land in the bed of navigable creeks, which, it claimed, although filled in, were still the lands of the State, and the claimant claims it all on the ground that the creeks have been filled in and the land is subject only to certain charges, as provided in chapter 425 of the Laws of 1954, by which the City of New York is empowered to sell its right and interest in Westchester Creek to the adjoining owners.
The land is divided into two parcels, parcel “A” and parcel “ B Parcel “A” comprises on the west the limits of the property running parallel to the land of the New York, New Haven and Hartford Railroad Company, to the southerly line of the Bronx Pelham Parkway; then on the east for about half of its length on a generally straight line towards the south about 225 feet east of the west boundary line, and for the remainder of its easterly portion on a line widening as it courses southerly from the afore-mentioned 225 feet to about 800 feet to the lands of the City of New York, or nearly so.
Parcel “ ~B ” comprises the balance of the land owned by claimant.
Parcel “A” is land generally "dry and parcel “ B ” is land generally marshy.
The lands of all the other claimants adjoin and are akin to the marshy land in parcel “ B ”. These are located at the easterly extremity of the lands taken and are about equidistant from the north and south location of the index finger.
Throughout the lands comprising the Gottfried claim, except the upper third thereof, and the lands of the other claimants, there are map streets and lots designated, but never laid out. For convenience, the tax office of Bronx County has subdivided these parcels as tax lots.
Within parcel ‘1 A ”, there were 10 warehouses, each one-story high, nine of which were in dimension 125 feet wide by 400 feet long, designated as buildings A, B, C, D, E, F, G, H and J, and one, building I, which was 75 feet wide by 400 feet long.
These warehouses extended from the south to the north along the westerly side of the land. The most southerly buildings, A, F and G, were in tandem; next in tandem came B and E, and *737 next followed 0 and D; next in single succession came H, I and J. To the west of the buildings from north to south, and between the buildings, there were macadam roadways. West of building “C” alongside the railroad tracks, there was a raised concrete loading platform 20 feet wide by 200 feet long.
The claimant Gottfried’s land, as well as the lands of the others, are about 14 feet below the established level of the street grades in that vicinity. Of all the claims herein, none had a street approach, except the claimant Gottfried. Her approach was by way of an easement over Haswell Street east of Eastchester Road.
An inspection of these properties, starting a short distance easterly from the warehouses across to the Hutchinson River Parkway, presented to the court a scene of swampy land with swamp grass and cat tails growing thereon, with dirty and muddy drainage channels running west to east along the line of the so-called “ Map ” Morris Park Avenue to the westerly right of way of the Hutchinson River Parkway. This channel then courses southerly along the parkway to the end of the property where it finally goes into the land previously acquired from Kathleen Gottfried by the City of New York in a condemnation proceeding; and after ponding there from one to two acres, continues under Westchester Avenue through a culvert and exits at the southerly side of Westchester Avenue through an eight-foot tidal gate into the actually navigable Westchester Creek.
Parcel “ A ” was originally 41 acres
Parcel “B” was originally 63 acres
or a total for both parcels of 104 acres.
The parties agreed that as a result of the New York City condemnation, the total remaining now to the claimant Gottfried
was 95.422 acres, divided as follows:

*738 The history of the acquisition of this land and buildings by the claimant Gottfried must be recounted to gain a clear picture of her claim.
Claimant and her brother-in-law, Philip Godfrey, who is the brother of claimant’s husband, Harold Gottfried (incidentally, the testimony amply shows that claimant was hardly more than a good housewife, who did not bother with the property in question and whose husband, Harold, was the actual author of her many and variegated operations with the property in question) purchased the 10 warehouses, and some other buildings which were involved in the New York City condemnation, from the War Assets Administration on August 5, 1949, on a bid of $175,100. The War Assets Administration had leased the ground upon which the buildings were erected from the New York, New Haven and Hartford Railroad Company, the owner.
These buildings were erected between the years 1945 and 1946, as temporary shelters of and for the disposal of war surplus materials. They were erected without the filing of plans or permission from the city. All the buildings were built about alike. They were built on hard fill with concrete footings and foundation walls, heavy duty six-inch reinforced concrete floors, with structural steel frames, steel columns and girders and steel roof beams. All the buildings had gypsum plank roofs except “ H ”, “I” and “J”, which had concrete channel slabs. All the buildings had composition roofing, and the lateral enclosures were all of asbestos masonite.
With these buildings were included the roadways before mentioned, water supply, fire protection, sewage disposal arrangements and a railroad siding affecting only buildings “ H ”, “ I ” and “ J
While these buildings were acquired on August 5, 1949, on November 15,1949, the claimant and her brother-in-law acquired an option to purchase parcel “ A ” (41 acres) from the owner, the railroad, for the sum of $282,500, which option they exercised on November 24, 1952.
Also on November 15,1949, they acquired an option from the owner, also the railroad, to purchase parcel “ B ” (63 acres) for $160,000. This option was exercised by the claimant alone on January 8, 1954, after she had acquired complete ownership as recounted in the following paragraph.
On January 8, 1954, pursuant to a judgment in an action between Kathleen Gottfried and Philip Godfrey, to dissolve their partnership, this claimant, at a Referee sale, acquired at public bidding parcel “A” and the improvements, as well as the *739 outstanding option for parcel “ B ”, for the sum total of $1,655,000.
It is of note here to set forth the fact that while the Federal Government did build and maintain said buildings without a permit from the City of New York, such was not the privilege of the claimant. Therefore, the claimant had to and did apply to the Board of Standards and Appeals of the City of New York for a variation to maintain said buildings, which was granted in words as follows: “ Resolved, that the Board of .Standards and Appeals does hereby amend the resolution adopted by the Board on June 27, 1950, so that as amended the resolution shall read: 6 Resolved, that the decision of the borough superintendent dated May 2, 1950 acting on Alt.Applic. 357-50, objection 1, be and it hereby is modified and the appeal be and it hereby is granted -under the powers vested in the Board under section 35 of the General City Law, to permit the maintenance of buildings within the beds of the following mapped streets: MeAlpine avenue, Cheeseborough avenue and Lang avenue, on condition that in the event the land for these streets is acquired by the City of New York, such buildings or portions of buildings as are located in the beds of proposed streets shall be removed at the expense of the owner, as proposed and as indicated on plans filed with this appeal marked “ Received May 25, 1950,” (one sheet), marked “ Received June 19,1950,” (four sheets), and marked “ Received May 10, 1950,” (one sheet); as to objection 2, to permit the continuance of the ten (10) existing class 5 metal structures for which no permit was issued to permit their construction in 1945, as shown on such plans above referred to for a temporary term of twenty-one (21) years from the date of this amended resolution for the general storage of merchandise provided no merchandise shall be stored within the buildings that would require a combustible or inflammable permit from the Fire Department; that such portable fire-fighting appliances shall be maintained as the fire commissioner shall direct in each building; that all permits shall be obtained and all work completed within three (3) months from the date of this amended resolution.’ ”
Between the years 1952 and 1954, the claimant generally made the following improvements:
Buildings A, F and J — replaced masonite walls with complete masonry siding with steel sash windows, with some glass blocks by the doors and marquees over door; buildings C, E and G — installed masonry siding to a height of 10 feet leaving the original masonite above to the roof; buildings B, D and I, were left with the original corrugated masonite siding and H had cinder blocks.
*740 Many interior improvements, such as heating, separate office . space, some new toilet facilities, new electrical wiring, etc., were made and the roadways were generally re-established by extensive repairs.
At the time of title vesting in the State, these buildings and the loading platform were all rented. The space between buildings “ C ” and “ H ” was thinly black-topped for parking convenience of tenants and employees.
The claimant gave testimony and produced leases which indicated that the gross rent then was $427,461.24 yearly.
The claimant and her land experts, Mr. McCormick and Mr. McCann, insisted that the overhead expenses were only about $62,800, including $41,000 taxes allocated to 1,000,000 square feet of land used in conjunction with the buildings. Upon this theory, the claimant figured her net income at $364,661.
Mr. McCormick and Mr. McCann both accepted without inquiry, but on past association, the sound value of the buildings submitted by Mr. Morris Jacks, a consulting engineer. Mr. Jacks stated that the sound value of all the buildings and exterior improvements was $3,612,200.
Mr. McCormick assumed 1,000,000 square feet of land was used in conjunction with the buildings. He placed a value on that land of $1.25 per square foot, or $1,250,000. He allowed a 6% interest earning on the land, or $75,000. In addition, he capitalized the $3,612,200 at 8% which would yield an annual return on the buildings of $288,976. To this he added the aforesaid $75,000 and the total of $363,976 he stated was the net income which sustained his valuation. This, he stated, proved his judgment correct in accepting Mr. Jacks’ valuation of the buildings.
In addition to its evaluation by the acre, Mr. McCormick valued the land also by the square foot, and in accordance with its zoning designations. His value of the land was $3,678,728. Thus, his total evaluation of this property was $7,290,928 (buildings, $3,612,200; land, $3,678,728).
Mr. Alfred I. Gassett, another industrial engineer, with an impressive background, testifying for the claimant, submitted what he described as competitive construction figures, the same as if he were bidding on plans for these buildings. He estimated the sound value of the buildings at $3,435,645.
On the other hand, for the land value, the State offered the testimony of Henry G. Waltemade, Frank S. Douglass and Max R. Levy. These three witnesses, too, have long, capable and respected experience in the field of appraising.
*741 These three disregarded the leases offered and proceeded upon an estimated gross rental of the buildings, which was lower than the claimed income by $90,461.24, asserting that these estimated rentals were more in line with the rental values of these buildings than those rentals specified in the leases. They indicated skepticism of some of the leases since at least three were between Harold Gottfried representing his wife, and his stepson and son-in-law. One lease alone to his stepson had risen from $20,000 to over $33,000, with no increased services.
Mr. Waltemade estimated gross rentals at $337,000, operating expenses, including taxes on the entire parcel at $114,500, leaving net return of $222,500. He capitalized it at 10% and came up with a total value of $2,225,000 for the buildings and land.
Mr. Douglass estimated gross rentals at $344,500 and expenses at $108,950, leaving a net return of $235,550. He capitalized the land and buildings separately, but came up Avith a total valuation of $2,400,000.
Mr. LeAry estimated his gross rentals at $337,000, the operating expenses at $112,450, leaving a net return of $224,550, which, capitalized at 10%, made the value of the entire parcel at $2,245,500.
These three appraisers also used the summation or residual method of appraisal. Mr. Douglass came up with a total value of $2,312,200, Mr. Levy with $2,560,000 and Mr. Waltemade Avith $2,550,000.
Since these three experts used similar breakdoxvns, the court will set out here Mr. Waltemade’s computations to afford a clearer picture of their approach to the summation valuation:

*742

Mr. Leo Baran, a building contractor and appraiser of buildings and fixtures, with long and varied experience, was offered by the State as its expert as to the sound value of the buildings, as well as the fixtures. He, like all the other witnesses in this case, was subjected to long and searching cross-examination. He estimated the sound value of the buildings and exterior improvements at $1,346,546.18 as against Mr. Jacks’ value of $3:612,200. Again, the court considers it important to a full understanding of this phase of the trial that the valuations given by these building experts be reproduced herein side by side for each item involved, in order that the court’s own valuations and views may be better understood. They follow:

Mr. Alfred I. Glasset, president of W. J. Barney Corporation, an industrial construction firm, who stated that his business was not appraising, but competitive construction bidding, gave his testimony on the basis of a bid based on the plans of the several buildings furnished to him by the claimant, with the items of cost estimate set up on that basis for each building, *743 including base estimates, adjustments of $427,750 for all buildings and site work (which he added to his own estimators1 basic costs, explaining that his estimators had figured too low); cost of foundation studies, architect and engineer’s fees and contingency. He took out $95,790 for “ betterment ” from a total cost estimate of all the buildings of $3,531,435 and came up with a total cost or bid of $3,435,645. He did not include costs of the exterior improvements. Thus it would appear that if we should add Mr. Jacks’ estimate of the sound value of the exterior improvements of $453,590, Mr. Glasset’s total bid would have been $3,889,235, or some $277,000 more than Mr. Jacks’.
It must be said here that while Mr. Glasset undoubtedly is a man of competence in his field, the court was not impressed with his reasoning in adding $427,750 for adjustments in the exhibit he submitted to the court. Assuming that his estimators had figured their bids too low, he should have rectified his figures in his own office and presented the complete base estimate to the court. The court feels that although such method may be considered sound, it is not assuring. It is singular how far experts feel they have to go to impress a court with their viewpoint when the solid facts and figures are all that the court requires.
The so-called “betterment” produced the same effect upon the court. For this Mr. Glasset deducted $95,790, as aforesaid, explaining that this much would have been added to his cost estimate if the buildings were new. Since his costs were based on sound value, he took this amount off his total cost estimate. He explained that the “ structures involved were nearly new and consequently we do not feel that depreciation as such is an important element in this appraisal.” The court disagrees with these conclusions.
Another important element in issue was that of the period of time required to erect the buildings. Mr. Glasset estimated that 52 weeks would be required, whereas, Henry L. Braun, also a licensed professional engineer, testifying for the State, estimated 25 weeks would be sufficient, but he would allow up to 40 weeks to take care of any and all interferences with the work. Both agreed that the number of weeks taken for the construction would have a material bearing on the cost.
With such wide divergencies of opinion of the physical aspects of the property and the values thereof, the court found it very necessary to call upon its own viewings, impressions and experience in addition to the testimony of the mentioned and also the unmentioned experts in order to arrive at its *744 conclusions. The court thus viewed these buildings on some five occasions in the company of the attorneys and experts, and also three times by itself.
The court, as the law requires, looked for every element possible in favor of the claimant whose property was being taken by the State, but could not remain indifferent to the true state of the subject property, as it appeared to the court. The court observed that the buildings were about 10 years old then, which fact was evident. Some of the buildings had been improved, but still none were “nearly new” as Mr. Glasset testified. Wear showed itself even on buildings remodeled a few years before. The surrounding improvements were being-used and showed wear and tear. The area itself presented a sort of “ run down ” aspect with marshes and weedy growth about it. The buildings were substantial but the condition I observed, in the main, represented quite a degree of economic depreciation. Still there was value in the subject property which we shall award to the claimant.
The court felt more satisfied with the testimony of Mr. Jacks and Mr. Baran. Mr. Jacks for the claimant, however, did not, in the court’s opinion, give due weight to the age of the buildings nor that their life span was legally limited to the year 1971, irrespective of whether these buildings would, with proper maintenance, be useful for another 40 years or more, as one witness testified. Mr. Jacks depreciated all the structures and exterior improvements at an average of 16% which the court considers was too conservative and not reflective of their actual condition and the legally remaining life. Mr. Baran, for the State, who gave his opinion that the buildings and exterior improvements had depreciated 48%, in the court’s opinion, was too generous with the depreciation he allocated for the structures and exterior improvements and somewhat too conservative with the cost of reproduction of the same. Confronted thus with these disparities in valuations, it was most necessary that not only the testimony offered, but a minute study and analysis of the court’s own voluminous notes, the innumerable exhibits and the court’s personal viewings of the buildings and the land involved in the takings, the neighborhood, the roads within the property of claimant and approaching roadways, etc., be marshaled by the court to permit a proper decision regarding the separate and total values of the buildings and exterior improvements.
Although the legal life of these buildings extends to the year 1971, the court would consider that a permit might be obtained to extend such life for some 10 years longer, as testified *745 to by Mr. Waltemade, and accordingly will give this element due consideration in the evaluations of said buildings. It is the court’s opinion that the value of the said buildings and exterior improvements as of August 31, 1956, would be the sum of $1,975,000 which, if applied separately to the various buildings, would be as follows:

The buildings were 10 years old on the vesting date. The various buildings have been set down separately principally to indicate that the court has considered the improvements made thereto and the condition as of vesting date.
These buildings, as afore-stated, were erected by the Federal Government without consideration to their possible length of life, since they served the immediate purpose of disposing of war surplus material. Most of the underground utilities were nonprogressive and would not have passed the Building Department requirements if built by a private person who had to comply with the law. Leeching fields, which are the accepted method of disposal of human waste in rural and sparsely settled areas are not permitted. Yet they were one of the means used to effect the disposal of waste. To effect a proper disposal of sewage would require a pumping station to empty waste into the city sewer wherever such was located. The underground wiring would have to be in waterproofed channels because of the wet subsurface and water and gas would require special protection. To overcome this condition, it is • the opinion of the court that a large amount of fill would have to be laid down over the existing soil for the purpose of first firming the ground and then providing a suitable base for any upper structures. It was contended by the State that this land was 14 feet below *746 the grade of established streets, and that to properly use her land, the claimant would have to fill it to that extent. The testimony, however, has convinced the court that such a large operation was not necessary to make normal use of this land. The court feels that a much less amount of fill would be satisfactory. The best evidence, however, that fill was necessary is that in addition to deep piling by the State (which was made necessary by the requirements of its very large structures the State is erecting, which are high and exceptionally heavy), the State laid down over 1,300,000 cubic yards of solid fill in section “ B ” and part of “ A ”, which would have been basically required for any use of the land for building purposes whether by the State or by the claimant; and this fill raised the grade of the land only a fraction of the 14 feet the State said was required by law to make the land adaptable for building use.
So, we have here, to be sure, a valuable installation. However, it was limited to certain specialized needs and for a determined number of years; we have not here one that could serve any purpose, or sustain any weight, or accommodate a large number of employees or any large operating machinery. There was value to this land, especially because of the large size of the plot, which is almost unique today within the City of New York, but it was a restricted type of value — good for just a certain use for a limited number of years unless - the owner undertook extensive piling in addition to fill, laid out extensive roadways, provided sanitary sewerage and installed water, lighting, streets, curbs, sidewalks, and many other items necessary to make it available for sundry purposes, and acquired a definite permit from the City of New York to keep these or other structures without limitation of time.
The court in this case, as afore-stated, has had many viewings of all the parcels involved, of all the buildings, interior and exterior, and has e\ron climbed on the roofs of certain buildings to fully acquaint himself with all the facets of these claims. It was very necessary for the court to arrive at a true value to do this, for while both sides produced too many witnesses and, in the court’s opinion, unnecessarily prolonged the trial of this claim for many days, these witnesses were, for the most part, highly regarded in their profession. These witnesses wore 60 far apart generally that one wonders if it were not apropos to suggest that permission be granted to the court in cases as complicated as these, to call as its own witness, others in the same field who would feel their obligation was solely to the Court as the searcher for the true value of the subject matter and to best serve the ends of justice.
*747 The court gave due consideration to the testimony affecting the purchase and repurchases of buildings and land and the year and cost thereof, as well as:
the improvements made;
the tax evaluation at time of vesting;
the so-called comparable sales;
the trend in real estate values to the date of vesting;
the location of property;
the rentals;
the lifespan of buildings and the condition of each building.
Eeturning to the land value, it should be said here that although the value of the buildings may be restricted as before indicated, the land suffers no such restrictions; as a matter of fact, the buildings have lent it, in part, a character, which must be and will be considered in determining its best and highest use, namely, industrial and residential. (Matter of New York, Westchester & Boston R. R. Co., 151 App. Div. 50; Matter of East Riv. Gas Co., 119 1pp. Div. 350 ; Matter of Albany Street, 11 Wend. 149.)
The comparable sales which were testified to were some of parcels near the appropriated parcels and in one case, the Miller case, of the prior sale of the parcel itself; and others were of parcels up to three miles distant from the area in question. The court considered them all, even the distant ones, for the purpose of gaining information which might lead to a fair value of the parcels in question.
The court here decides that the land lying in the beds of Westchester and Stoney Creeks, agreed to contain 7.112 acres, is owned by the State. It is a basic tenet of law that the State owns all land under navigable waters. This applies to the bed of any creek artificially filled in, as this was. (City of New York v. Wilson Co., 278 N. Y. 86; Hinkley v. State of New York, 234 N. Y. 309; People ex rel. Blakslee v. Commissioners, 135 N. Y. 447.)
Under certain circumstances, where the lands or navigable waters are not held in trust for the public, the State may surrender title to navigable waters by letters patent or by adverse possession over 40 years. (Civ. Prac. Act, § 31; Hinkley v. State of New York, supra.) However, none of these benefits to her were proved by the claimant. Where no letters patent have been issued, the presumption of adverse possession does not arise unless proven by the claimant. Although it was obvious that the claimant exercised unchallenged dominion over the creek lands, it was not proven when the creeks had been filled *748 in. The claimant limited her proof to her right to the creek lands by asserting that such right of ownership in her is implicit in the passage by the Legislature of chapter 425 of the Laws of 1954. This chapter amended article 3 of title D of chapter 41 of the Administrative Code of the City of New York by inserting therein a new section, to be known as section D41-45.1. This new section, in subdivision (a) thereof gave to the Board of Estimate of the City of New York permissive power to grant, convey and release to the owners of the lands fronting on either side of certain described lands (of which the land under consideration is a part) formerly under the waters of Westchester Creek now filled in, ‘ ‘ all of the property, right, title and interest of the city within, and to ” such lands. Subdivision (c) thereof provided that in conveying such land, the Board of Estimate shall not be obliged to convey the land within one half of such lands formerly under the waters of the creek to the owner of the land abutting on such half, but might convey to the owner of the land abutting one one side thereof, or to such abutting owners as require the same to make their abutting land more available for improvements.
The court construes this chapter as merely granting to the City of New York permission to release to the adjoining landowner whatever right and interest it possessed in and to the middle of the creek. Any such right and interest the city might assert in and to such land in the bed of the creek would seem, in the absence of any proof to the contrary, to be only an assumption of title on its part. The court has had presented to it no evidence that the city is the owner in fee of such lands, nor has it been referred to or found any law which would indicate that the city is the owner thereof. Such representation of title by the city might well be contestable by parties aggrieved, particularly in view of the provision of subdivision (d) of the chapter referred to above, which reads as follows: “ Neither the enactment of this section [n]or any conveyance made by the board of estimate pursuant thereto shall operate as a determination that the city has any interest in the lands now or formerly under the waters of such creek or on any of its arms, branches or tributaries nor as a waiver of any interest the State of New York has in such lands nor as a waiver of the provisions of article six of the public lands laws in respect to application's for a grant of any interest the State has in such lands, nor as a consent by the State to the use of such lands prior to a grant by the State pursuant to said article of any interest it has therein. ’ ’
The parties finally agreed that the following were the acreage and square feet involved in the various zoned areas of the *749 Gottfried claim to be considered by the court, 88.310 acres or 3,846,783.6 square feet and 7.112 acres for the creek land or 309,797 square feet. The court finds that the claimant sustained damage to the 88.310 acres in the sum of $2,275,771, which, for the purpose of understanding, is divided as follows:

Although the court determines that title to the land in the bed of the creeks is in the State, and therefore, no award is made to the claimant for the same, the court has, nevertheless, set a value for such land in the sum of $82,432.60, to indicate the court’s total consideration of what was claimed, and which, following the stipulation of the parties as to areas, is divided and valued as follows:

In arriving at the values above set forth, the court considered that there was contiguity between the marshland and the upland of this claimant. The land could all be properly developed as one entity with suitable approaches to all parts by roadways which the owner could construct. That is the distinguishing feature between this claimant’s land and that of the other claimants, which is reflected in the damages awarded.
The advantage of contiguity to a roadway was not available to the lands of Frances Miller, Lark Holding Co., Jack M. Vincent and Elsie Jacobs, which were all landlocked, and could have an approach to a roadway only by permission of and through the lands of Gottfried. This applied also to the lands of the City of New York, of which we spoke previously. The nearest roadway to these other lands was the Hutchinson River Parkway, which is a nonaccessible State highway. These lands were all in the marshy area, commonly designated as the marshland.
It is my opinion that the land of Frances Miller, consisting of 125,967 square feet, was worth $15,116, having figured its value at 12^ per square foot, for which amount a judgment may be entered.
*750 The land of Lark Holding Co., consisting of 10,000 square feet-, was worth $1,200, having figured its value at 120 per square foot, for which amount a judgment may be entered.
The land of Jack M. Vincent, consisting of 9,500 square feet, was worth $1,140, having figured its value at 120 per square foot, for which amount a judgment may be entered.
Concerning the claim of Jack M. Vincent, the court is aware that a deed bearing revenue stamps of $1.40 was delivered to Vincent on June 8, 1955, and that Vincent executed a purchase-money mortgage of $12,000 which still encumbers the land. The court said at the trial, and repeats now, that the court docs not accept this transaction at its face value. At best it can be said that the parties must have intended some other piece of land instead of this landlocked, water-soaked small parcel of land.
The land of Elsie Jacobs, consisting of 40,815 square feet was worth $4,898, having figured its value at 120 per square foot.
However, with regard to the Elsie Jacobs’ claim, there is a question to be determined before an award may be considered. The said land consists of the land to the middle thereof lying in the bed of the streets in front of and adjoining the lots or plots which were acquired by the City of New York by in rem foreclosure. Elsie Jacobs had previously owned those lots which were acquired by the City of New York. As previously stated, there were no streets or lots physically laid out. These were all map streets and lots. The claimant asserts that a foreclosure in rem, being a very technical and statutory right given to the city by the Legislature, relates only to the boundaries of the tax lots in the strictest interpretation of the law, and does not include the land lying in the bed of the streets mapped out but never established. The claimant contends that the city never acquired such land since it chose to exclude it from its own tax rolls.
The sympathy of the court is all with the claimant. In rem foreclosure, as specified in the law, is a very drastic remedy afforded to the city. The machinery employed is all in favor of the city. It gives the owner no right of redemption such as is enjoyed in a mortgage foreclosure; it requires no service of any legal papers upon the unwary owner except a notice by mail; and after that is mailed to the owner, upon the expiration of a very short period of time given him to pay his tax arrears, he, failing to do that, has only one remedy left, and that is to compete at a public sale, with sharp-eyed specialists in this method of acquisition of real estate. These latter may bid or very often overbid the full value of the land which the owner must surpass or top if he wants to get his property back. In other words, the owner could owe a forgotten water bill for $15, *751 while his property may be worth $10,000. If he reacquires the property for $10,000 or $15,000, the city keeps all that purchase money. The owner gets no credit for, according to that particular law, he really buys that which he did not own. This state of affairs fractures the conscience of those who fight for equity and fair play.
Nonetheless, the law is the law, until public repugnance changes it. Such was the law when Jacobs’ property was foreclosed. Did that foreclosure of her lots carry with it the land adjoining thereon to the center of the street, the same as normally happens when one sells his lots to another in a negotiated sale?
The answer must be in the affirmative for the reason that when land is bounded by a street, it is implied in the ownership of a lot that the land to the center of the street follows the ownership. (Bissell v. New York Cent, R. R, Co., 23 N. Y. 61; Haberman v. Baker, 128 N, Y. 253, 259.) How else, indeed, would one enter his own property?
This presumption that title extends to the center line of the street may be rebutted, under some circumstances, (White’s Bank of Buffalo v. Nichols, 64 N. Y. 65; Tietjen v. Palmer, 121 App. Div, 233.) Additional evidence may be admitted to explain the deed, in a proper case. (Haberman v. Baker, supra.) Such evidence is admissible, however, only where the language of the deed is susceptible of more than one interpretation. When the deed is complete and unambiguous, all other evidence is excluded. (Loch Sheldrake Associates v. Evans, 306 N, Y. 297, 304, 305; Uihlein v. Matthews, 172 N. Y. 154, 159: Blackman v. Riley, 138 N. Y. 318; Armstrong v. Du Bois, 90 N. Y. 95.)
It is settled law that unless otherwise specifically excluded from being a basic adjunct of the contiguous plot, the land in front of and to the middle of the street is part and parcel of the plot ownership whether acquired by metes and bounds description, by lot number out of a subdivision or in any other manner without conditions of exclusions. (Fiebelkorn v. Rogacki, 280 App, Div. 20, affd. 305 N. Y. 725: Johnson v. Grenell, 188 N. Y. 407; Hennessy v. Murdock, 137 N. Y. 317, 323; Bissell v. New York Cent. R. R. Co., supra; Goulding v. Town of Tonawanda, 282 App. Div. 321; Nemet v, Edgemere Garage & Sales Co., 73 N. Y. S. 2d 921, 924.)
Here, it could be argued, there never was any such relationship of plot to land in the bed of the street created by the owner or anyone else. The city, in creating lots and plots for its own taxing convenience had left out of those lot dimensions the land in the streets. It may well be said that taxes and death are the *752 surest things on earth, hut while death applies equally to all, without exception, taxes are levied by the municipality on property so designated by it. It must be correct in doing so. If it chooses to leave out of its tax impost lands in the streets as here, it alone is to blame and not the owner. In a technical sense, the court would say that the city did just that. The tax rolls made no mention of the beds of the streets, and the lots were assessed by lot number. Nevertheless, a sense of justice would prompt the court to decide that, however inexpert the city was in this case, all of the claimant’s land was certainly intended to be included, and should be. Here again, there is scant authority on the question as to whether the lien of the unpaid taxes extended to the part of the streets on which the lots abutted. Since the description in a deed of a numbered lot abutting on a street is sufficient to pass title to the center of the street upon which the lot abuts, the same description on an assessment roll should be sufficient also to include one half of such street. The court, therefore, holds that at the time of the in rem proceeding the taxes were a lien upon the part of the beds of the streets in front of the numbered lots, and the sale in the in rem proceeding passed title to the city to such part of the streets. (See Snyder v. County of Monroe, 2 Misc 2d 946; see Wolf v. Veterans of Foreign Wars, 5 N. J. 143, 74 A. 2d 253.) Therefore, the claim of Elsie Jacobs is dismissed.
We shall now consider the fixtures claims of which there were three, namely:
No. 1 — Parkway Center, Inc.....claim no. 35298
No. 2 — Parkway Center, Inc.....claim no. 35478
No. 3 — Marway, Inc............claim no. 35210
(This last claim was assigned before the trial to Parkway Center, Inc.)
Claim No. 1 (35298) demands as follows:

*753 Claim No. 2 (35478) demands as follows:

It was asserted by the claimant that these fixtures were all installed by the assignor-tenants and were all therein at the date of vesting. The State offered no adequate testimony to disprove this assertion on the part of the claimant, but contended that between the vesting date and the years 1958-1959 when the subtenants had moved out of certain buildings there was a large quantity of fixtures missing from buildings “A” and “B ”, and that all the fixtures were missing from buildings “ C ” and “ D ”. No charge of fixtures being removed from the other buildings was made. The State made the argument that the claimant was responsible for the missing items and should not be compensated by the court. As to the missing articles, as weH as those left behind, the State also raised the issue as to their true worth and their characterization as fixtures on the date of vesting.
To understand this involved state of affairs, the chronology of events must be recounted as developed at the trial.
The testimony indicated that on August 24, 1956, in contemplation of the State’s vesting title seven days later, on August 31, 1956, the State, by the Commissioner of Mental Hygiene, entered into a lease with Parkway Center, Inc. In this exhibit it is stated: 1 ‘ Whereas, it is the intention of the Commissioner of Mental Hygiene to cause a copy of said Map and Description to be filed in the office of the Register of the City of New York for the County of Bronx, whereupon the appropriation of the property shown and described on said Map and Description will become complete and title to said property will become vested in the State.”
By the terms of this lease, the State leased to Parkway Center, Inc., all of parcel “A” wherein were located the 10 warehouses, for a term of two years, for a total sum of $360,000. *754 The present tenants were permitted to remain as subtenants of the claimant who would retain their rental payments but also be solely responsible for all expenses involved in the maintenance and upkeep of all of parcel “A”. Later, the terms of payment were readjusted but the other terms remained.
The controversy involved in these claims concerned acts, conditions, situations and happenings which occurred, concerning the fixtures, during the aforesaid leasehold period to Parkway Center, Inc.
The State offered photographs which were taken 21 months after the vesting date in March and May, 1953, purporting to indicate the lack of fixtures claimed by claimant. These were offered in conjunction with the testimony of one Henry P. Flynn, who was an associate building construction engineer in the Department of Public Works, and of one Donald John Kirsch, an inspector on the job site for the Department of Public Works,
Essentially, Flynn testified that his duties commenced in November, 1958; that about January, 1959, he examined buildings “ C” and “D” and found that all electrical and toilet fixtures had been removed. The photo exhibits bear that out.
He further stated that in March, 1959, the field office, after it had been broken into, was moved from a shanty on the grounds to the front part of building “A”. Mr, Gottfried occupied then and continued to occupy the rear part of building “A ”, Flynn noted that there were no electric or toilet fixtures in building “ A ”.
On April 10, 1959, he saw a trailer belonging to Gottfried in the loading dock of building “ A ”, in which trailer there were electric wiring, electric panels, conduits, transformers, etc. He noted that these were used material.
On February 12, 1959, he had visited building “ E ”, wherein he saw some 40 to 50 taxicabs which were being broken up. Who put them there he did not know. However, these are not in question since Gottfried had given some one permission to store and break up these cabs for parts.
He also visited building ‘‘ F ”, then occupied by Farberware. The fixtures here were intact. In building “ B ”, occupied at that time by Catholic Charities, he noticed only temporary ceiling bulb lights. Both these subtenants remained in occupancy long after the trial.
Flynn testified that he took photos of the interior and exterior of these buildings in contemplation of the imminent demolition of said buildings. He further testified that as far as he knew, no inventory of the fixtures was made by the Department of *755 Public Works. He said the State employed no watchmen on this vast job; only the contractors had watchmen.
He had seen strange junkmen as well as an authorized junk-man about the property. He never called the police or otherwise complained to his superiors.
The other State witness, Donald John Kirsch, testified that he worked at the site from November, 1957 to May, 1959. In the month of December, 1958, he asserted that he heard noises in building “ D ”, which was supposed to be locked. He entered through a small door and saw Gottfried and five or seven men rolling and loading electric cables in Gottfried’s trailer. This same trailer and cables he saw later in building “ A ” in the portion occupied by Gottfried. Upon questioning Gottfried’s superintendent, he was told by the latter that they were salvaging wire, cables, etc. At other times he also heard noises of men working in other buildings but since Gottfried had the keys he could not enter. He stated that he saw men employed by Gottfried going in and out of buildings. He also saw the taxicabs going in and out of building ” E ” for a period of three months.
He also questioned Gottfried about the cables, etc. Gottfried told him he was removing them to Camp Shanks where Gottfried owned large properties. Later, on a visit of discovery, he saw the same Gottfried’s trailer in Camp Shanks. Kirsch stated that he did not know the legal relationship of the parties concerning the wiring, cables, etc., and that except for one occasion he saw only an authorized junkman on the premises who would only pick up scrap from the filling-in operation.
In his own defense, Gottfried denied that he took any of the fixtures claimed for herein. He asserted that when the buildings were purchased by his wife and brother from the Government in 1949, there was a lot of extra material left behind by the Government, such as cables, wiring, switches, conduits, paint, pitch, felt, light fixtures, desks, shovels, etc. These he had stored in a large space in the back of the building described as the Cafeteria Building which, prior to the State’s vesting, had been involved in the New York City condemnation against the same owner, of the eight-plus acres adjoining to the south of the State acquisition. Then, he explained, when this building was demolished by the city, about 1958, he removed those materials to building “ D ” with the permission of the tenant therein.
Gottfried also asserted that when Kirsch questioned him and practically accused him of pilfering, he indignantly told Kirsch *756 to watch out for the “ junkies ”, who, Gottfried charged, were doing the pilfering. He also testified that during the Summer of 1958, Kirsch called the police from Gottfried’s office and that as a result thereof, the police arrested four youths, but nothing came of that arrest.
On cross-examination, Gottfried asserted that he was telling the truth and not Kirsch. These sharp and not friendly exchanges were accentuated by the State, in its attempt to discredit Gottfried, offering proof of his conviction for conspiracy in a Federal court, while Gottfried offered a certificate from the Coast Guard, expressing its gratitude to him for serivces rendered to it during the second World War.
However, Gottfried was corroborated in his denial of taking any of the fixtures by one Frank W. Barbieri, who worked for him at the site as superintendent-handy man during the years 1957 and 1958. Barbieri stated that the buildings were broken into by unknown persons on a number of occasions and that there were many “ junkies ” about the premises. He stated that building “A” was broken into 14 to 18 times. He said he brought this to the attention of Kirsch, but nothing was done. Another employee, Walter Westphal, also corroborated Gottfried with much the same testimony as that of Barbieri.
Regarding the value of the fixtures, the claimant offered the testimony of Morris Jacks, the engineer and building expert afore-mentioned. Mr. Jacks testified that the sound value of the fixtures in claim No. 1 (No. 35298) for buildings B, C, D, G, I and J, was $81,010. The original claim was for $72,150. The difference is made up by Mr. Jacks’ allocating a sound value of $16,760 for the fixtures in building “ B ” against the original claim of $7,900 and then reducing the claim for building “ I ” from $5,295 to $4,169. No motion was made to amend this claim.
Mr. Jacks also testified that his appraisal for the fixtures in claim No. 35478 for building “ A ” was $90,515.
Mr. Jacks also testified that his appraisal for the fixtures in claim No. 3 (No. 35210), set up in and as part of Claimant’s Exhibit 3 in claim No. 35298, for buildings “E” and “ F ”, was for $40,245.
Mr. Jacks asserted that the various values he gave were his opinion of the sound value of the fixtures on the date of vesting. He stated that he applied a 10% over-all depreciation on all the fixtures whether electric cables, furnace, partition, flooring, racks, etc., on the basis of a 30-year life.
The count and measurements of the various items were made by his subordinates, but the final figures and opinions were his, He said measurements were approximate.
*757 Mr. Jacks’ testimony indicated, too, that in one way or another he had been concerned with the whole group of Gottfried claims since 1954. He testified that he was engaged in 1954 by Mr. Goldwater who told him that the State was considering acquiring the Gottfried property for a mental hospital.
At this juncture, Mr. Goldwater explained for the record that he had been approached in 1954 by representatives of the State, who hold him the State desired the Gottfried property for a mental hospital and thus, feeling assured the State would take the said property, he had engaged Mr. Jacks in 1954 to inspect the buildings and render his inventories for the various matters under consideration.
Here it may be appropriate to recount that Mr. Jacks made a first appraisal of the original Marway, Inc., claim (No. 35210) but was not retained by Marway when it filed its own independent claim to which was attached the inventory made by one Ruden who, as aforesaid, was not called to testify. Ruden’s inventory was for a sound value of $27,423.49. It was stated that Gottfried bought this claim for a valuable consideration and at the trial it was amended to $40,245, claimed to represent the sound value of the fixtures involved. This discrepancy was accounted for by Mr. Jacks by Ms testimony that he had added thereto the value of the commercial wiring and some smaller fixtures which Ruden had not listed in the original claim.
Mr. Jacks contended that the many items were in good condition, and generally that removal of the fixtures would do very little damage to the building but that most of these, when removed, would not be usable. He conceded for most fixtures a salvage value but would give no opinion as to what that value would be. He characterized many items as fixtures which the court thinks were not, whether specifically contested by the State or not.
To the court’s surprise, the State advised the court it would rest its case on this testimony. The court inquired whether or not the State had made an inventory of the fixtures claimed, and upon being assured it had, requested that it be presented. Thereafter, the State offered as one of its fixture experts Mr. Leo Baran, the building expert previously mentioned.
It was at about this time that a young Assistant Attorney-General, Mr. Paul F. Brown, took over the State’s defense, for Mr. Austin had now retired from public service. He showed competence and discharged his duties well.
Mr. Baran testified that he had long experience in appraising fixtures and was acquainted with the sound values of the items *758 in question. His testimony was that he first examined the buildings involved concerning the fixtures claims on August 4, 1953. He found many of the items missing then. Again, on April 13, 1959, he examined the buildings and discovered that the other items already testified to as missing were gone.
Mr. Baran also testified that he made notes of what he found and assigned to the items a sound value, but never submitted a written inventory to the State. He also studied Mr. Jacks’ appraisals and heard his testimony. He gave it as his opinion that in 1958, valuing the fixtures as of 1956, they had depreciated 50% as of the date of vesting.
Mr. Baran asserted that in inspecting the buildings in 1958, he found most of the items of fixtures either broken down or missing, except the electric wiring, exhaust ducts, gas piping, Venetian blinds, metal mesh partitions, tile, where these had not been removed.
Mr. Baran stated that his testimony applied alike to all the buildings involved. He set no dollar value on these claims, saying that in his building evaluation he had allowed $10,000 in building “ A ” (claim No. 35478) for the fixture items as an element of the building value. For the fixtures in the buildings in claim No. 35298, he gave $1,640 for building “I ”, $6,220 for building “ J ” and no value to the others. He stated that by giving no monetary value to these items he did not mean that they had no value. They formed, he stated, only an inventory to which he applied no value.
Regarding Parkway Center, Inc. (claim No. 35210), which, as already said, had been amended to $40,245 from $27,423.49, Mr. Baran stated that he had added the sound value of . the light fixtures to the original claim, among some other small items, which altogether was $12,720, for the reason that he considered them fixtures and not personalty. He stated that $10 each for the fixtures was a good sound value. He stated that he knew that Marway vacated the premises in 1957.
He conceded that most of the measurements given by him for the items of fixtures requiring measuring were approximate and were not made by him but by his subordinates.
The State called in another electrical fixtures expert to rebut Mr. Jacks regarding claim No. 35210, one Harry Dunst. He stated that he was an electrical contractor for over 35 years. Mr. Dunst also was a very competent witness. He produced a number of trade bills made out by wholesale dealers about the date of vesting, for many items similar to those set forth in the itemized inventory attached to claim No. 35210 and marked as claimant’s Exhibit 3. These bills sustained the values he *759 assigned to the corresponding items in the claim. As to the Other items for which he had no bills, he testified he knew from his knowledge their values as of August 31, 1956. lie stated that for the most part, his valuations were not opinions but actual market value. The court found his testimony direct and convincing. He figured the material and labor in the Marway claim to be worth as of 1956, the sum of $15,000 against the $27,423.49 claimed in the original claim and stated that by applying a depreciation of 71/v% on the electrical items, which he said was fair, he came up with the sound value of $13,875.
Before reaching a final determination of these three claims, it may be well to first consider whether the electric fixtures in building “A”, which Mr. Jacks added to the original claim ■were fixtures, as he claimed, or personalty.
One must concede that the electric fixtures were necessary for the proper operation of the tenants’ businesses in building “A”; but because of their necessity had they acquired such annexation to the building or such special status as to render them a permanent asset to the building along with the wiring and outlets?
To meet the test of permanence there must be present, first, actual annexation to the realty; second, application to the use or purpose to which that part of the realty to which it is connected, is appropriated; and, third, the intention of the party making the annexation to make a permanent accession to the freehold (Potter v. Cromwell, 40 N. Y. 287, 296-297).
The fact that the article may or may not be removed without injury to the building or to itself is not as much controlling (Voorhees v. McGinnis, 48 N. Y. 278) as is the intention to make the annexation a permanent accession to the freehold. (Potter v. Cromwell, supra.) Intention, of course, is spelled out either directly by the terms of the lease or other agreement or by the mode of annexation. Thus, light fixtures especially adapted for and installed in a church or theatre would clearly indicate an intent to make of those fixtures a permanent annexation, whereas fixtures of a standard make and common usage, used merely to afford sufficient and efficient lighting for the use then made of the premises, would remain personalty unless the intent was otherwise.
"We shall now examine the annexation of the fixtures in building “A”. "We find that the electric fixtures are atlached by bolts, nuts and screws to the ceiling sockets through which flow's the electric current. It is common knovdedge that these may be detached without damage to the sockets or to themselves, and may be replaced by other electric fixtures.
*760 Now then, assuming that the tenant wished to replace any or all of those fixtures during the tenancy, could he do so without the consent of the landlord? Under the circumstances indicated here, namely, the lack of agreement or intent as to the implications of the annexation of the fixtures, the answer must be in the affirmative, for that which one buys remains his until he relinquishes his title thereto. In like manner could it be said that the landlord could prevent the removal of those fixtures at the end of the lease, or prevent the tenant from passing title thereto to an assignee of his lease, or prevent the inclusion of the fixtures in a chattel mortgage or prevent a Sheriff from executing against such fixtures? The answer to these questions would be in the negative, for there is no intent disclosed that would indicate that the tenant did not consider the fixtures to be his, nor does the mode of annexation present a different answer. We, therefore, hold that the light fixtures not only in building “A ”, but in the other buildings involved in the three claims, were not compensable fixtures.
Under somewhat similar circumstances, the courts have held a concrete stone fountain connected to a water main and electric wiring to be severable (Metropolitan Stone Works v. Probel Holding Corp., 131 Misc. 519), and finishing hardware and lock sets of standardized type already installed were declared personalty, whereas butts and hinges holding doors were not (Goldberg & Sons v. Weisberg-Goldman Corp., 146 Misc. 720, affd. 235 App. Div. 717, affd. in part 260 N. Y. 690, remittitur amd. 261 N. Y. 535), and a sprinkler system was declared severable (Prudence-Bonds Corp. v. 1000 Is. House Co., 141 Misc. 39), although everyone knows that such system is well attached to a ceiling or beams; and kitchen cabinets installed against the wall have been held to have remained personalty. (New York & Suburban Fed. Sav. & Loan Assn. v. Crescent Constr. Corp., 196 Misc. 532.)
On the other hand, where the parties have agreed in the lease that a diner and its concrete foundation are to remain personalty as between them, the courts accept such concept even though as to others these would be fixtures. (Tinnerholm v. State of New York, 15 Misc 2d 311.) However, where articles are claimed to be fixtures, such claim may not be allowed when the court finds that they are not so attached that their removal would either injure the building or so damage the items themselves as to render them useless. Therefore, claims for items, including but not limited to wood storage bins, pipe tire racks, work benches, water cooler, will not be allowed. The mere fact that the articles involved herein are attached to the floor or post *761 or wall merely for the purpose of stability does not render them fixtures. (Murdock v. Gifford, 18 N. Y. 28; McRea v. Central Nat. Bank of Troy, 66 N. Y. 489; Matter of the City of New York [Collins], 118 App. Div. 865, affd. 189 N. Y. 508.) To change the character of a chattel to one of a fixture requires more than nailing or bolting it to the floor or to a wall or ceiling. This is normally a precaution against damage of the chattel itself and for the safety of individuals and not an intention to surrender ownership thereof.
There being, however, fixtures remaining which are compensable, the court cannot accept the State’s contention that whatever was the value of those of the fixtures which were found to be missing in 1958 and 1959 that the State is not answerable therefor to claimant. In this connection, it seems rather strange that the State, which knew that claims would be filed, instead of using its limitless facilities to taking photographs of the interior of these buildings and having made for its own protection an expert inventory of the fixtures in the buildings, at or about the time of the vesting of title, contented itself to doing just that, but two and three years later. What happened to the fixtures after August 31, 1956, the date of vesting title in the State, is of no consequence in the trial. The law is clear that the State, by its appropriation, is deemed to have bought all the land it took and all that was annexed thereto. It was then that it became liable to the claimants herein for all that it appropriated. What happened later did not lessen its obligation to pay the full value of all it assumed dominion over. (Jackson v. State of New York, 213 N. Y. 34; Matter of City of New York [Allen St.], 256 N. Y. 236; Matter of City of New York [Collins], 118 App. Div. 865, affd. 189 N. Y. 508, supra; Kahlen v. State of New York, 223 N. Y. 383, 388.) In the Jackson case, the building appropriated contained machinery, shafting, elevators and conveyors which, because of the manner in which they were annexed to the freehold, and the purpose of the annexation, were such that as between vendor and vendee, they would have constituted fixtures. The court held (p. 36) that “ an appropriation of land, unless qualified when made, is an appropriation of all that is annexed to the land, whether classified as buildings or as fixtures * * *. The rights of the parties became fixed at that time, and must then be reciprocal. ’ ’ In Matter of City of New York (Allen St.) (supra), the court held that the city takes the property condemned, as it then exists, thereby extinguishing all existing rights and interests in the property taken.
*762 Service of the notice of appropriation, under the provisions of the statute is “the vital act appropriating the lands for which the state must pay.” (Ontario Knitting Co. v. State of New York, 205 N. Y. 409, 417.)
The very lease the State made to Gottfried for all parcel “A” specifically stated “title to said property will become vested in the State.” If the State had accepted that maxim of law at the trial, many days of trial would have been saved; instead, it chose to deny its obligations on the untenable contention that the lease to Gottfried made its responsibility for the fixtures applicable only at the end of the lease and not the day of vesting title in the State.
Assuming that after August 31, 1956, Gottfried pilfered any or all fixtures he was accused of pilfering by the State, the State, like anyone aggrieved, should have had him arrested, or could have sued him and his corporation for the value of what it claimed he had taken, or should have filed a counterclaim against the claimant in these claims.
The State chose to exercise none of these rights when it could have done so. It cannot ask the court now to pull its chestnuts out of the fire it created.
This state of affairs leaves the court sad but bound to ascertain only if what Parkway claims as fixtures were there on the date of vesting, what were or were not compensable items, and the sound value thereof as of the date of vesting. From the credible testimony adduced, the court determines that the items claimed as fixtures were in the buildings on the date of vesting title.
The court makes full allowance of their sound value for most of the partitions, Venetian blinds and other objects which were built especially for the location they were in. Their removal might do a minimum of damage to the building but a great deal to the objects. These would be reduced to scrap or to mere salvage xmlue.
The court does not agree with the assertion by Mr. Jacks that almost none of the fixtures, electrical or otherxvise, had any salvage value. The testimony indicated that many of these items could have been reused or sold for salvage. In spite of the fact that neither side allocated any money value to salvageable items, the court will consider this phase in arriving at its decision regarding these fixtures claims.
The court is of the opinion that the damages sustained by the claimant for alloxvable fixture items as of August 31,1956. xvas for;
*763 1. Claim No. 35298, the sum of $33,455, which for the purpose of clarification is divided as follows:

2. Claim No. 35478, the sum of $38,660, which for the purpose of clarification is divided as follows:

3. Claim No. 35210, including buildings E & F, the sum of $20,720 is awarded.
Upon the award in each claim herein, interest shall be figured as of August 31, 1956.
The sum of $1,500,000 already advanced to the claimant, Kathleen Gottfried in claim No. 34349, shall bear interest from August 31, 1956 to November 6, 1957, the date of its payment. This sum of $1,500,000 shall be deducted from the land and buildings awards to the said Kathleen Gottfried, which total the sum of $4,250,771, thus leaving a balance of $2,750,771 remaining due to the said claimant, with interest thereon from August 31, 1956 to the date of entry of judgment.
The separate findings of fact and conclusions of law submitted by the parties will be signed by the court. This decision and the findings of fact and conclusions of law as signed, shall be considered as complementary to each other. Let judgments be entered accordingly.