118 N.J. Super. 594 (1972)
289 A.2d 542
ROBERT F. GARRETT, III, PLAINTIFF,
v.
STATE OF NEW JERSEY, CITY OF OCEAN CITY, NEW JERSEY AND UNKNOWN DEFENDANTS, THEIR HEIRS, DEVISEES AND PERSONAL REPRESENTATIVES AND HIS, THEIR OR ANY OF THEIR SUCCESSORS IN RIGHT OF TITLE OR INTEREST, DEFENDANTS.
Superior Court of New Jersey, Chancery Division.
Argued January 14, 1972.
Decided March 6, 1972.
*597 Mr. Robert F. Garrett, III, pro se.
Mr. Morton I. Greenberg, Assistant Attorney General argued the cause for the State (Mr. George F. Kugler, Jr., Attorney General, attorney).
FRANCIS, J.S.C.
Plaintiff, by way of a bill to quiet title, seeks to perfect his title to certain lands lying in Ocean City, N.J., a portion of which was at one time the bed of Weakfish Creek. Weakfish Creek is a tidal stream which at one time flowed southeastwardly parallel to what is now 59th Street in Ocean City and continuing in that direction from the bay beyond Asbury Avenue. The West Jersey and Seashore Railroad Company, deciding to lay tracks across Weakfish Creek running northeastwardly and southwestwardly, obtained a grant from the State of New Jersey dated March 6, 1922. This grant contained two tracts, each five feet long and 60 feet wide at both shore lines, with an accompanying right to fill in between these tracts a width of 60 feet to *598 accommodate the roadbed of the railroad. This had the effect of suddenly drying up the lands to the southeast of the rail line. Plaintiff in his bill to quiet title includes as a portion of the premises in his complaint the lands which were below Weakfish Creek prior to the action of the railroad. The records of the State show that it was understood that this would close the creek, an obvious result because tide could not flow through such a project.

I
The riparian grant vested the railroad with a small portion of land on each side of the creek with the accompanying right to fill in the creek within the two areas of the grant although it did not convey them. Nothing either expressly or by implication divested the State of any title to any other portion of the creek. The deed of the State must be construed in its favor. See River Development Corp. v. Liberty Corp., 51 N.J. Super. 447 (App. Div. 1958), aff'd 29 N.J. 239 (1959). That case held that a legislative grant was to be strictly construed in favor of the sovereign and most strongly against the grantee. It follows a fortiori that a third-party claim under the deed is subject to the same interpretation.
Further evidence of a lack of intent to alienate the tidelands is revealed by the recognition of the Appellate Division in River Development Corp. v. Liberty Corp., supra that the State has never alienated its interest in them except as follows: (1) the common law privilege confirmed by the Wharf Act (repealed in 1891) to reclaim to the low water line; (2) legislative license; (3) grant or lease under a special act; (4) conveyance of the fee or a leasehold interest with an option to take the fee as provided by the General Riparian Act of 1869. 51 N.J. Super. at 470. To this list may be added (5) acquiescence in condemnation and (6) consent judgments in settlement of title disputes in quiet title actions.
*599 In view of the fact that a reading of the grant will not support any contention that there was an intentional divestment of title on the easterly side of the railroad bed, the question arises as to whether the closing of the creek under the authority of the State as a matter of law divested the State of its title to the bed of the creek. The answer to this question should be "no." First of all, of course, there has been no consideration paid the State for anything other than the rights set forth in the riparian grant instrument itself. That instrument recites on its face that the consideration of $200 was for the land described in the complaint and not otherwise. By L. 1894, c. 71 the riparian land was placed in the School Fund. See River Development Corp. v. Liberty Corp., supra, 51 N.J. Super. at 474-75. This is still the state of the law. N.J.S.A. 18A:56-5 and 6. Under both the Constitution of 1844, Art. IV, § VII, par. 6, and the Constitution of 1947, Art. VIII, § IV, par. 2, the Fund for the Support of Free Public Schools and all money, stock and other property appropriated for that purpose has been declared to be a perpetual fund. Thus, a gift of such property, even for public purposes is, unconstitutional. See In re Camden, 1 N.J. Misc. 623, 639-641 (Sup. Ct. 1923); Henderson v. Atlantic City, 64 N.J. Eq. 583 (Ch. 1903). As a result of these ruling public agencies, including the New Jersey Department of Transportation, must obtain grants before taking riparian lands for their projects. N.J.S.A. 12:3-33.
It follows, therefore, that if plaintiff is right in this matter, the officers of the State, in making the grant in question and authorizing the closing of Weakfish Creek, acted unconstitutionally. They received no consideration for the portion of the creek on the east side of the embankment and yet the same was closed and the tidewaters were excluded therefrom. Such administrative action can hardly be countenanced and, of course, the court should construe the legal result of their administrative action so as to avoid an unconstitutional result. But in any event, as a matter of *600 law at common law, before the adoption of the School Fund Act, the action of the riparian commissioners attempting to divest the State of its ownership on the easterly side of the embankment would have been ineffectual, just as in Henderson v. Atlantic City, supra, where an easement deed for a $1 consideration was voided. The present constitutional and statutory provisions, cited supra, would work the same effect.

II
At common law the artificial exclusion of water from a tidal stream does not as a matter of law divest the sovereign of its ownership of the bed of the stream. The State's title to the lands under tidal water is proprietary. Bailey v. Driscoll, 19 N.J. 363, 367 (1955). But title to such lands may be divested by the State where there is a gradual and imperceptible accretion and erosion along tidal streams.
Accretion and reliction are companion theories. "Accretion is the process of gradual and imperceptible addition of solid material, called alluvion, thus extending the shore line out by deposits made by contiguous water," and reliction is "the gradual withdrawal of the water from the land by the lowering of its surface level from any cause." Ziemba v. Zeller, 165 Nev. 419, 86 N.W.2d 190, 193 (Sup. Ct. 1957). Both theories are recognized in New Jersey. Skowysz v. Ventnor, 110 N.J. Super. 340, 349 (Law Div. 1969), aff'd 56 N.J. 168 (1970). The term "dereliction" rather than "reliction" is used in this case. The two terms are used interchangeably. See 65 C.J.S. Navigable Waters § 81, at p. 252, and Black's Law Dictionary. "Where, by the process of accretion and reliction, the water of a river gradually recedes, changing the channel of the stream and leaving the land dry that was theretofore covered by water, such land belongs to the riparian owner." Ziemba v. Zeller, supra, 86 N.W.2d at 193. "The right to acquisitions to land, through accession (accretion) or reliction, is itself one of the riparian rights." *601 Klais v. Danowski, 373 Mich. 262, 129 N.W.2d 414, 422 (Sup. Ct. 1964). The doctrines allowing such acquisition of title are founded on the principle of compensation to the riparian owner for his losses occasioned by erosion and inundation, and to preserve the riparian owners' right of access. See Harz v. Board of Commerce and Navigation, 126 N.J. Eq. 9, 16 (Ch. 1939), aff'd 127 N.J. Eq. 341 (E. & A. 1940), and 65 C.J.S. Navigable Waters § 82(1), at p. 256. But it is apparent that such acquisition is only permissible where the accretion or reliction was gradual or imperceptible, or both. Neither a theory of compensation nor of the right of access as meant by the cases would appear applicable to plaintiff's claim.
The gradual processes of accretion and reliction are to be distinguished from the more rapid, easily perceived and sometimes violent shifts of land incident to floods, storms or channel breakthroughs known as "avulsion." Bauman v. Choctaw-Chickasaw Nations, 333 F.2d 785, 789 (10 Cir.1964). Avulsion has been defined as "a sudden and perceptible loss or addition to land by the action of water or otherwise." Barakis v. American Cyanamid Co., 161 F. Supp. 25, 29 (N.D. Tex. 1958). Avulsion sometimes contemplates the abandonment of an old stream bed and the creation of a new one. 65 C.J.S. Navigable Waters § 86 at p. 269. The action of the railroad in filling in the right-of-way and the consequent rerouting of Weakfish Creek could be said to be an artificial avulsion. Thus, "the legal effect of an act of the government in changing the main channel or current of a river may be analogous to a change caused by avulsion." 65 C.J.S., supra, at p. 269. The reasoning would be the same where the railroad under its grant from the State accomplished the same action.
Foreign jurisdictions have dealt with the question of the artificial reclamation of land by drainage operations. In Conoley v. Naetzker, 137 So.2d 6, 7 (Fla. D. Ct. App. 1962), the court held: "If the disputed parcel was in fact reclaimed land resulting from drainage operations, then defendants *602 as riparian owners on a navigable waterway could not have acquired title through reliction." (Emphasis supplied). This case cited the Florida case set forth in the State's brief, Martin v. Busch, 93 Fla. 535, 112 So. 274 (Sup. Ct. 1927):
If to serve a public purpose, the state, with the consent of the federal authorities, lowers the level of navigable waters so as to make the water recede and uncover lands below the original high water mark, the lands so uncovered below such high water mark, continue to belong to the state. Reliction is the term applied to land that has been covered by water, but which has become uncovered by the imperceptible recession of the water.
The doctrine of reliction is applicable where from natural causes water recedes by imperceptible degrees, and does not apply where land is reclaimed by governmental agencies by drainage operations. [112 So. at 287]
In Barakis v. American Cyanamid Co., supra, plaintiff was an argicultural lessee of a riparian owner who was a political subdivison of the state, namely a water district. Plaintiff sued American Cyanamid, an upstream owner, for polluting the water. After holding that the lease transferred no riparian rights to plaintiff, the court noted that some of plaintiff's leasehold was "man-made" through the efforts of the Water District and held that "the land built up artificially by the Water District comes under the doctrine of avulsion." 161 F. Supp. at 29. The court further held that an avulsion did not change boundary lines, so that plaintiff's riparian rights ended where the man-made tract began.
In Gottfried v. State, 23 Misc.2d 733, 201 N.Y.S.2d 649, 666 (Ct. Claims 1960), mod. 14 A.D.2d 612, 218 N.Y.S.2d 286 (1961), aff'd 11 N.Y.2d 1084, 230 N.Y.S.2d 229, 184 N.E. 2d 197 (1962), the trial court held, without discussing avulsion: "It is a basic tenet of law that the State owns all land under navigable waters. This applies to the bed of any creek artificially filled in, as this was."
In Padgett v. Central & Southern Fla. Flood Con. Dist., 178 So.2d 900 (Fla. D. Ct. App. 1965), the court said:
*603 The doctrine of reliction * * * is applicable to additions created by the recession of waters from natural causes; it does not apply to land reclaimed by drainage operations of governmental agencies Where, as here, the state causes or permits the level of a navigable lake to be lowered so as to make the water recede and thereby uncover lands below the original high-water mark, lands so uncovered continue to belong to the state. [at 904]
In Noyes v. Collins, 92 Iowa 566, 61 N.W. 250 (Sup. Ct. 1894), the Supreme Court of Iowa refused to award the owner of land along a lake the bed thereof when it appeared that the waters had been excluded by draining and filling. It declared:
The rule is, in order to entitle the adjoining property holders to the right of possession of land left bare by receding water, that the recession must be gradual, slow and imperceptible. In case of a sudden and sensible recession of the water, the ownership of the land will not be changed.
The fact is that the courts have been careful to protect the State from the loss of its title to the tidelands. Thus, in O'Neill v. State Highway Department, 50 N.J. 307 (1967), it was declared:
It is settled that the State's title in tidelands cannot be lost by adverse possession or proscription. * * * The same considerations bar an estoppel against the State to assert its title because of delay or inaction.
The court has also declared that an in rem foreclosure procedure will not bar the State's claim to the tidelands even though the statute by its terms could indicate that such a result could be reached. Transcontinental Gas Pipeline v. Department of Conservation & Economic Development, 43 N.J. 135 (1964).
It is true, of course, that the State, in causing the creek to dry up, may have deprived the abutting owners of their ability to reach the water for navigation. However, this cannot affect the result because there is no constitutional right to navigate in front of the property owned by a riparian owner. This matter was settled in New Jersey by the Court *604 of Errors and Appeals in the case of Stevens v. Paterson Railroad Co., 34 N.J.L. 532 (E. & A. 1870). That case held that the State could make a grant in front of the owner of upland abutting on a tide-flowed stream without any compensation to the upland owner even though he lost his right and power to reach the stream. The court declared:
From these authorities and many others which might be cited, it appears to me to be plain, that by the rules of the ancient law, the owner of the land along the shore was entitled to no right as an incident of such township (sic. ownership), except the contingent ones before referred to of alluvion and dereliction; and that, on the other hand, the title to the soils under tidewater was in the sovereign; and that such title was attended with the usual concomitants of the ownership of realty. [at 544]
The Stevens v. Paterson Railroad Co., supra, case is the constitutional bedrock of N.J.S.A. 12:3-33 and it is on the authority of that case that large numbers of grants have been made to public agencies cutting off the upland owner from the water.
It should be noted that in Leonard v. State Highway Department, 24 N.J. Super. 376 (Ch. Div. 1953), aff'd 29 N.J. Super. 188 (App. Div. 1954), the State Highway Department took possession of title riparian lands in front of an upland owner and that there was no suggestion in the case even made that if the State in fact has good title to the property, the upland owner would be entitled to compensation by reason of the construction of the road in front of his property. Further, there is no provision for compensation in N.J.S.A. 12:3-33 which deals with grants to other public agencies including the State Department of Transportation. If the State can authorize the Department of Transportation to construct a road in front of upland abutting a tidal stream and thereby fill in the property without vesting title to the new road in the upland owner, it follows the State can also cause the bed of the stream to be dried out without thereby losing its title.
The State's motion for summary judgment will be allowed.
Order accordingly.