4 A.3d 542

CITY OF LONG BRANCH, A MUNICIPAL CORPORATION OF THE STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT, v. JUI YUNG LIU AND ELIZABETH LIU, HIS WIFE, ADELINA'S PIZZA, JIMMY'S PIZZA, JIMMY JETTY, INC., AND JIMMY'S FAMOUS BOARDWALK HOTDOG, DEFENDANTS–APPEL-LANTS, AND ADMINISTRATOR OF SMALL BUSINESS AD-MINISTRATION, HOROAPH CO., L.L.C. T/A DAIRY KING, GIFTED SARA, WIZARD WORLD, INC., SPECIALTY MER-CHANDISE ASSOCIATION, FUNHOUSE, AND CLUB 115, DE-FENDANTS.

Argued December 2, 2009—Decided September 21, 2010.

*Peter H. Wegener* argued the cause for appellants (*Bathgate, Wegener & Wolf,* attorneys; *Mr. Wegener* and *Christopher B. Healy,* on the briefs).

*Paul V. Fernicola* argued the cause for respondent (*Mr. Fernicola,* attorney; *Mr. Fernicola* and *Robert E. Moore,* on the briefs).

*Russell M. Finestein* submitted a brief on behalf of amicus curiae New Jersey Land Title Association (*Finestein & Malloy,* attorneys; *Mr. Finestein* and *Michael D. Malloy,* on the brief).

*Dean Jablonski,* Deputy Attorney General, submitted a brief on behalf of amicus curiae Attorney General of New Jersey (*Paula T. Dow,* Attorney General, attorney; *Melissa H. Raksa,* Assistant Attorney General, of counsel; *Mr. Jablonski* and *William E. Andersen,* Deputy Attorney General, on the brief).

*Gordon N. Litwin* submitted a brief on behalf of amicus curiae American Littoral Society, Inc. (*Ansell Zaro Grimm & Aaron,* attorneys; *Mr. Litwin* and *Andrew J. Provence,* on the brief).

*Stefanie A. Brand,* Acting Public Advocate of New Jersey, submitted a letter brief on behalf of amicus curiae Department of the Public Advocate (*Ms. Brand,* attorney; *Ms. Brand* and *Brian Weeks,* Deputy Public Advocate, on the letter brief).

Justice ALBIN delivered the opinion of the Court.

In this appeal, defendants Jui Yung Liu (through his heir or heirs) [1] and Elizabeth Liu, his wife, claim that they did not receive just compensation for their oceanfront property, which was taken by plaintiff City of Long Branch through its power of eminent domain. First, in a pretrial ruling, the trial court rejected the Lius' contention that the value of their property should have been increased to reflect the approximately 225 feet of dry land added to the shoreline of their property as the result of a government-

---

[1] Jui Yung Liu died in 2002, after the commencement of the litigation in this case. Based on the record before us, we do not know whether his estate, through an executor or heir, has been substituted in his place for purposes of this action. For that reason, we continue to refer to him as a defendant.

funded beach replenishment program. The Appellate Division affirmed. We do so too. Under the public trust doctrine, and long-standing common-law principles, the land seaward of the mean high water mark belongs to the people of this State.[2] The rapid infusion of sand to the beach by the government-funded project, extending the dry land seaward from that earlier mean high water mark, did not result in a change in title to the formerly submerged land. That new dry beachfront—previously lapped by the ocean's tides—remained in trust for the benefit of the people of New Jersey. Accordingly, the Lius were not entitled to be compensated for land that they never owned.

Second, at the conclusion of the condemnation trial to determine the value of the Lius' property, the jury found that "a reasonably willing purchaser" would not have paid substantially more for the property because of the property's furnishings, fixtures, and equipment. The trial court denied the Lius' motion for a new trial, maintaining that the verdict was not a miscarriage of justice. The Appellate Division affirmed on this issue as well. Here, the jury was properly charged on the law and had the opportunity to weigh and evaluate the evidence and credibility of the witnesses. On that basis, we agree that the verdict valuing the Lius' property is unassailable and must be upheld.

This opinion proceeds in two parts. On each issue, we address separately the relevant facts and trial and appellate court rulings. We first determine whether the trial court erred by not including as part of the landmass of the condemned property the increased acreage of shoreline resulting from the beach replenishment project. We then turn to whether the trial court erred in not overturning the verdict of the jury, which concluded that the Lius were not entitled to additional compensation for the property's furnishings, fixtures, and equipment.

---

[2] The high water mark is the point where the ocean ends and the dry sand begins at high tide. The mean high water mark is that point calculated based on the "average of all the high tides over a period of 18.6 years." *O'Neill v. State Highway Dep't*, 50 *N.J.* 307, 323–24, 235 *A.*2d 1 (1967).

## I.

In 1996, the City of Long Branch (City) passed an ordinance adopting a redevelopment plan for areas of beachfront property in the municipality. As part of the redevelopment project, the City sought to acquire oceanfront property, including commercial property located at 115 Ocean Avenue owned by the Lius. The Lius' property contained a wood deck and building supported by pilings. Inside the building, the Lius ran a number of businesses, such as Jimmy's Famous Boardwalk Hotdog, The Café, and Club 115, and leased space to other commercial tenants, such as Wizard World Arcade.

The Lius rejected the City's offer to purchase the property for $900,000. Consequently, on May 14, 2001, the City filed a complaint to take the Lius' property through the power of eminent domain. In the complaint, the City described by metes and bounds the property conveyed to the Lius in a 1977 deed. The easternmost part of the Lius' property extended to the 1977 mean high water mark of the Atlantic Ocean. However, by the time the City initiated its condemnation action in May 2001, the Lius' beachfront had increased by more than two acres from the description given in the 1977 deed, and the prior mean high water mark was approximately 225 feet inland.[3]

The expanded landmass was the product of a beach replenishment program undertaken in the mid- to late 1990's. The federal, state, and a number of municipal governments partnered in a multi-million dollar beach replenishment program to restore and preserve the shoreline of various Jersey shore communities. The City of Long Branch contributed over 1.3 million dollars in municipal funds to the beach replenishment program; overall, the federal government expended 27 million dollars and the State 10 million dollars on the program. The United States Army Corps of

---

[3] The relevant portion of the deed describing the Lius' property in relationship to the ocean is fairly precise: "North 88 degrees 55 minutes East along said South line 125 feet to the high water mark of the Atlantic Ocean."

Engineers spearheaded the project, using methods such as pumping sand from beneath the ocean's surface and throwing it onto the shoreline, thus extending the length of dry land on the beach. The dumping of sand off the shore of the Lius' property occurred over an approximately two-week period. That two-week beach replenishment program produced approximately 225 additional feet of dry land seaward from the mean high water mark described in the Lius' 1977 deed. In all, the work of the Army Corps of Engineers, financed by the City, State, and federal government, extended the beach in front of the Lius' property by more than two acres.

## A.

The Lius moved to amend the City's complaint describing their property to account for the increase in the shoreline's landmass resulting from the beach replenishment project. They claimed title to the expanded beachfront as the upland owners, and argued that they should be compensated for the taking of the newly created land by eminent domain. The Honorable Robert O'Hagan, J.S.C., denied both the Lius' motion to amend the complaint's description of the property and the motion for reconsideration. In a written opinion, Judge O'Hagan concluded—through the application of common-law principles—that the increased landmass seaward of the mean high water mark designated in the Lius' 1977 deed, created by the government-funded beach replenishment program, belonged to the people of the State of New Jersey, not the Lius. *City of Long Branch v. Liu*, 363 *N.J.Super.* 411, 413, 417–18, 833 *A.*2d 106 (Law Div.2003).

Judge O'Hagan recognized that, generally, land covered by tidal waters up to the mean high water mark is owned by the State in trust for the people. *Id.* at 417, 833 *A.*2d 106. He also recognized that, under the common law, an avulsion—"a sudden ... addition to land caused by either natural or manmade force"—does not result in a change of title to the previously submerged lands. *Id.* at 416, 833 *A.*2d 106. In other words, in the wake of an avulsion,

the State does not lose title to the dry land added to a beach—the land seaward of the previous mean high water mark that had been covered by the tides and therefore belonged to the State. *See ibid.* Judge O'Hagan determined that the two-week beach replenishment program constituted an avulsion and consequently the upland owners, the Lius, did not gain title to the new dry land added to the shoreline. *Id.* at 414, 416, 833 *A.*2d 106. Last, Judge O'Hagan noted that the Lius offered no proof that the approximately 225 feet of dry beach seaward of the mean high water mark listed in the 1977 deed was the result of accretion—the slow, imperceptible addition of sand—rather than the government-funded beach replenishment program. *Id.* at 413, 418, 833 *A.*2d 106.[4]

## B.

In an unpublished opinion, the Appellate Division affirmed the trial court's ruling, but on different grounds. The appellate panel declined to "delve into the distinctions drawn by the common law" between an accretion and avulsion. Instead, the panel resolved that "no policy justification" would permit the Lius to reap a private monetary benefit—an enhanced valuation of their property in a condemnation action—as a result of a public agency spending public funds for a restoration project that increased the area of dry land on the beach.

## II.

We granted the Lius' petition for certification, *City of Long Branch v. Liu,* 200 *N.J.* 211, 976 *A.*2d 387 (2009), to review their claim that they were "entitled to compensation for the taking of land created by [the] beach replenishment project[ ]." We granted the motion of the New Jersey Land Title Association to appear

---

[4] The upland owner gains title to the addition of dry beach by means of accretion. *See Borough of Wildwood Crest v. Masciarella,* 51 *N.J.* 352, 357, 240 *A.*2d 665 (1968).

as amicus curiae. After we heard oral argument, we invited the Attorney General of New Jersey, the American Littoral Society, Inc., and the Department of the Public Advocate to participate as amici and posed to them the following question: "Who owns the property that previously was below the mean high water mark and that becomes dry land as a result of a government funded beach replenishment project?"

The answer to that question and the more specific question of whether the Lius have a right to be compensated for the more than two acres of newly created beach through a government-funded project must begin with an understanding of common-law principles governing the ownership of tidally flowed lands.

## III.

### A.

The legal principle that the State holds "ownership, dominion and sovereignty" over tidally flowed lands "in trust for the people" traces its origins to Roman jurisprudence. *Matthews v. Bay Head Improvement Ass'n*, 95 *N.J.* 306, 316–17, 471 *A.*2d 355 (1984). The notion that the sea and its shores are "common to mankind" and that "the shores may be said to be the property of no man," Justinian, *Institutes* 2.1.1, 2.1.5 (Thomas Collett Sandars trans., Longmans, Green & Co. 8th ed. 1888), is the genesis of what today is referred to as the public trust doctrine, *Matthews, supra*, 95 *N.J.* at 316, 471 *A.*2d 355. The public trust doctrine, as conceived in ancient times, allowed not only use of the water for navigation and fishing, but also access to the seashore. *Borough of Neptune City v. Borough of Avon–by–the–Sea*, 61 *N.J.* 296, 304, 309, 294 *A.*2d 47 (1972). For example, in Roman times, this doctrine allowed fisherman to dry their nets on the seashore's sand. Justinian, *supra*, at 2.1.5.[5] The public trust doctrine was

---

[5] Under Roman law, the seashore—for purposes of the right to public access— "extend[ed] to the limit reached by the greatest winter flood," Justinian, *supra*,

passed down to the common law of England, where the king—the sovereign—possessed title to tidally flowed lands for the benefit of all people. *Matthews, supra,* 95 *N.J.* at 317–18, 471 *A.*2d 355; George P. Smith II & Michael W. Sweeney, *The Public Trust Doctrine and Natural Law: Emanations Within a Penumbra,* 33 *B.C. Envtl. Aff. L.Rev.* 307, 310–11 (2006). After the American Revolution, title to tidal lands in New Jersey transferred from the king to the State, where sovereignty vested in the people. *Avon, supra,* 61 *N.J.* at 303, 294 *A.*2d 47.

 Like many common-law principles, the public trust doctrine has adapted to the "changing conditions and needs of the public it was created to benefit." *Avon, supra,* 61 *N.J.* at 309, 294 *A.*2d 47. Today, "public rights in tidal lands are not limited to the ancient prerogatives of navigation and fishing, but extend as well to recreational uses, including bathing, swimming and other shore activities." *Ibid.* In addition, limited use of the upland owner's dry sand is permitted under the public trust doctrine when it is "essential or reasonably necessary for enjoyment of the ocean." *Matthews, supra,* 95 *N.J.* at 325, 471 *A.*2d 355 ("The complete pleasure of swimming must be accompanied by intermittent periods of rest and relaxation beyond the water's edge.").

 Generally, the State of New Jersey "owns in fee simple all lands that are flowed by the tide up to the high-water line or mark," *O'Neill v. State Highway Dep't,* 50 *N.J.* 307, 323, 235 *A.*2d 1 (1967),[6] and the owner of oceanfront property holds title to the property upland of the high water mark, *Borough of Wildwood*

---

at 2.1.3, not to the mean high water mark, the dividing line today between the upland owner's property and the State's tidally flowed land.

[6] Private owners can have an interest in submerged tidal lands through riparian grants. *See, e.g., N.J.S.A.* 12:3–20 to –24. A riparian grant is the conveyance by the State of tidally flowed lands to a private owner. *Panetta v. Equity One, Inc.,* 190 *N.J.* 307, 318, 920 *A.*2d 638 (2007). The State's tidelands have been dedicated to the support of public schools, and the proceeds from sales of the State's tidelands constitute a part of the State's permanent school fund. *N.J.S.A.* 18A:56–5. No riparian grant is at issue in this case.

*Crest v. Masciarella,* 51 *N.J.* 352, 357, 240 *A.2d* 665 (1968).[7] The shoreline to the ocean, however, is in a constant state of flux. It sometimes changes imperceptibly over a course of years due to the erosion or addition of sand to the beach. And it sometimes changes dramatically and swiftly due to natural causes, such as a hurricane, or manmade causes, such as the beach replenishment program in this case. The ever changing nature of the shoreline raises questions concerning property ownership when, by natural or artificial means, sand is either added to or taken from a beach. The common law has developed a set of principles that govern the property rights of the upland owner and the State to tidally flowed lands when events alter the shoreline.

We now turn to those principles.

## B.

The mean high water mark, generally, is the boundary line that divides private ownership of the dry beach and public ownership of tidally flowed lands. That boundary line is not fixed, but fluctuates over time through the processes of accretion, erosion, and avulsion.

An "accretion" is the addition of sand, sediment, or other deposits, called alluvion, that extends the dry shoreline seaward "gradually and imperceptibly—that is, so slowly that one could not see the change occurring, though over time the difference became apparent." *Stop the Beach Renourishment, Inc. v. Fla. Dep't of Envtl. Prot.,* —— *U.S.* ——, 130 *S.Ct.* 2592, 2598, 177 *L.Ed.2d* 184, 193 (2010); *Garrett v. State,* 118 *N.J.Super.* 594, 600, 289 *A.2d* 542

---

[7] Oceanfront property is often referred to as littoral property. "Littoral" means "[o]f or relating to the coast or shore of an ocean, sea, or lake." *Black's Law Dictionary* 1018 (9th ed. 2009). By contrast, "riparian" means "[o]f, relating to, or located on the bank of a river or stream." *Id.* at 1441. Our case law often uses the word riparian broadly to encompass tidally flowed lands, including those flowed by the ocean. *See, e.g., Masciarella, supra,* 51 *N.J.* at 356, 240 *A.2d* 665 (citing riparian cases dealing with accretion to resolve oceanfront owners' claims).

(Ch.Div.1972).[8] Erosion—the opposite of accretion—is the gradual and imperceptible withdrawal of alluvion from the shoreline, thereby shortening the amount of dry land on the beach. *See Black's Law Dictionary* 621 (9th ed. 2009) (defining erosion as "the gradual eating away of soil by the operation of currents or tides"). Under the common law, the owner of oceanfront property takes title to dry land added by accretion, but loses to the State title over land that becomes tidally flowed as a result of erosion. *Masciarella, supra,* 51 *N.J.* at 357, 240 *A.*2d 665; *see also Stop the Beach Renourishment, Inc., supra,* —— *U.S.* at ——, 130 *S.Ct.* at 2598, 177 *L.Ed.*2d at 193. Although the mean high water mark may shift due to accretion and erosion, it remains the dividing point between the upland owner's property and the tidally flowed land held in trust for the people. The doctrine of accretion and erosion is founded "on the principle of natural justice"—that "[t]he proprietor of lands having a boundary on the sea is obliged to accept the alteration of his boundary by the changes to which the shore is subject[,] . . . [losing] by the same means that may add to his territory. . . ." *Masciarella, supra,* 51 *N.J.* at 357, 240 *A.*2d 665 (quoting *Ocean City Ass'n v. Shriver,* 64 *N.J.L.* 550, 555, 46 *A.* 690 (E. & A.1900)).

Unlike accretion and erosion, an avulsion is "a sudden and perceptible loss or addition to land by the action of water or otherwise." *Garrett, supra,* 118 *N.J.Super.* at 601, 289 *A.*2d 542 (citation and internal quotation marks omitted); *Dickinson v. Fund for the Support of Free Public Sch.,* 95 *N.J.* 65, 77 & n. 7, 469 *A.*2d 1 (1983) (citing *Garrett*); *see also Stop the Beach Renourishment, Inc., supra,* —— *U.S.* at ——, 130 *S.Ct.* at 2598, 177 *L.Ed.*2d at 193. An avulsion, therefore, is "more rapid [and]

---

[8] Another way in which the mean high water mark may be altered is when the water level lowers slowly and imperceptibly, thus creating additional dry land. This process is known by the term reliction. *See Garrett, supra,* 118 *N.J.Super.* at 600–01, 289 *A.*2d 542. At common law, a reliction is generally treated no differently than an accretion. *See ibid.* (calling accretion and reliction "companion theories"). Reliction is not an issue in this case.

easily perceived" than accretion and erosion, and comes about by "sometimes violent shifts of land incident to floods, storms or channel breakthroughs." *Garrett, supra,* 118 *N.J.Super.* at 601, 289 *A.*2d 542. An avulsion, which produces a sudden gain or loss of shoreline, does not result in a shifting of the property line. *See id.* at 601–02, 289 *A.*2d 542; *see also Dickinson, supra,* 95 *N.J.* at 77, 469 *A.*2d 1. The prior mean high water mark remains the demarcation line between the property rights of the oceanfront owner and the State. *See Garrett, supra,* 118 *N.J.Super.* at 601–02, 289 *A.*2d 542; *see also Stop the Beach Renourishment, Inc., supra,* —— *U.S.* at ——, 130 *S.Ct.* at 2599, 177 *L.Ed.*2d at 193 (describing how under common law "regardless of whether an avulsive event exposes land previously submerged or submerges land previously exposed, the boundary between littoral property and sovereign land does not change; it remains (ordinarily) what was the mean high-water line before the event"); *Bryant v. Peppe,* 238 *So.*2d 836, 837–38 (Fla.1970) (finding that formerly submerged land, exposed by hurricane, "was originally sovereignty land; and it did not lose that character merely because, by avulsion, it became dry land"); *Black's Law Dictionary* 157 (9th ed. 2009) (describing that land covered by water due to "avulsion remains the property of the original owner"). The principles of accretion and avulsion date back to English common law and Roman jurisprudence. *See* 2 William Blackstone, *Commentaries* *262; Justinian, *supra,* at 2.1.20, 2.1.21.

The doctrine of avulsion "mitigate[s] the hardship of drastic shifts in title that would result if the doctrines of accretion, erosion, and reliction were applied to sudden and unexpected changes in the shoreline." *Walton County v. Stop the Beach Renourishment, Inc.,* 998 *So.*2d 1102, 1114 (Fla.2008), *aff'd,* —— *U.S.* ——, 130 *S.Ct.* 2592, 177 *L.Ed.*2d 184 (2010). The practical result of an avulsion is that when land is added to the beach, the prior mean high water mark will be located on dry land and the State will have title to the beach seaward of that point. On the other hand, when an avulsion results in the tides covering what

was earlier dry sand, the mean high water mark probably will be located under the ocean, and the upland owner will have title to tidally flowed beach. Because the preexisting mean high water mark does not change with an avulsion, if a hurricane washes away one hundred feet of beach and is followed by a hurricane adding one hundred feet of beach, there is neither a gain nor a loss to the upland owner or the State.

The law, generally, makes no distinction between whether an accretion or avulsion is the product of natural forces or manmade efforts. *See Masciarella, supra,* 51 *N.J.* at 354–55, 359, 240 *A.*2d 665 (making no distinction between accretion that is caused by natural means or government-constructed jetty); *Garrett, supra,* 118 *N.J.Super.* at 597, 601, 289 *A.*2d 542 (finding railroad's filling and rerouting of tidal stream was artificial avulsion); *see also New Jersey v. New York,* 523 *U.S.* 767, 770–71, 784, 118 *S.Ct.* 1726, 1730–31, 1737, 140 *L.Ed.*2d 993, 1005–06, 1013–14 (1998) (holding that federal government's filling of Hudson River next to Ellis Island was avulsion, therefore sovereignty to new dry land remained with New Jersey, because new land fell on New Jersey's side of river).[9]

For example, in *Wildwood Crest v. Masciarella, supra,* the upland owner gained title to dry sand through the process of accretion, even though partly caused by a government-funded project. 51 *N.J.* at 355, 361, 240 *A.*2d 665. In that case, the defendants, the upland owners of property bordering on the Atlantic Ocean, received in 1915 a riparian grant that conveyed to it 1000 feet of submerged land seaward of the then-mean high water mark. *Id.* at 354, 240 *A.*2d 665. Fifty years later, 1200 feet of submerged land off of the defendants' property had become dry land due to accretion stimulated in part by manmade efforts—"the

[9] The State, however, may not gain title to upland property by causing tidal waters to flow over that property. *O'Neill, supra,* 50 *N.J.* at 324, 235 *A.*2d 1. That is not the issue here. The only question is whether the State retains title to land it owned that was raised up above the mean high water mark.

Government's construction of jetties in 1911" and its closing of a nearby inlet—and in part by natural forces. *Id.* at 354–55, 240 *A.*2d 665. The defendants claimed that they owned title to not only 1000 feet of the dry sand, which constituted the land conveyed in the riparian grant, but also the additional 200 feet of dry sand under the doctrine of accretion. *Id.* at 355, 240 *A.*2d 665. No one disputed that the 1200 feet of new dry land was the product of accretion, and this Court affirmed the chancery court's finding that "the accretion was caused by a combination of natural and artificial causes." *Ibid.*

Applying common-law principles, the chancery court and this Court rejected "the suggestion that because artificial structures may have contributed to the accretion it should be deemed the property of the State." *Id.* at 359, 240 *A.*2d 665.[10] Indeed, we did not distinguish an artificial structure, such as a jetty, from natural forces as a cause of accretion. *Id.* at 355, 359, 240 *A.*2d 665. The Court affirmed the chancery court's judgment that the upland owners took title to the previously submerged land by virtue of the riparian grant and the doctrine of accretion.[11] *Id.* at 361, 240 *A.*2d 665.

On the other hand, *New Jersey v. New York, supra,* is an example of a government-funded project that brought about an

[10] The Court "point[ed] out that the judicial decisions elsewhere assert very broadly that gradual and imperceptible accretions belong to the upland owners though they may have been induced by artificial structures." *Masciarella, supra,* 51 *N.J.* at 359, 240 *A.*2d 665 (citations omitted).

[11] There are exceptions to the doctrine of accretion, however. For example, the upland owner will not gain title to newly added land if the accretion was the result of the owner's own actions or a project by the State done "in aid of navigation (or other public project unrelated to shore protection)." *Masciarella, supra,* 51 *N.J.* at 359, 240 *A.*2d 665. As the trial court in *Masciarella* explained, "the upland owner should not be permitted to enlarge his own estate at the expense of the State," and where title to the accretion is essential to aid navigation, "it must be held that the private rights yield to the interest of the public." 92 *N.J.Super.* 53, 62, 222 *A.*2d 138 (Ch.Div.1966), *aff'd,* 51 *N.J.* at 358–59, 240 *A.*2d 665 ("We agree entirely with this holding. . . ."). These exceptions are not at issue in this case.

avulsive event, the expansion of Ellis Island by a landfill operation in the Hudson River. 523 *U.S.* at 770–71, 784, 118 *S.Ct.* at 1730, 1737, 140 *L.Ed.*2d at 1005, 1013. In the early days of the Republic, New York had title to Ellis Island, which is located on the New Jersey side of the Hudson River in New York Harbor. *Id.* at 770, 772–73, 118 *S.Ct.* at 1731–32, 140 *L.Ed.*2d at 1005–07. New York transferred title to the island to the federal government and, in time, Ellis Island became the point of entry for immigrants arriving in the United States in the late nineteenth century through the mid-twentieth century. *Id.* at 772–77, 118 *S.Ct.* at 1732–33, 140 *L.Ed.*2d at 1006–09. To meet the needs of the massive influx of immigrants, the federal government engaged in a mammoth landfill operation undertaken by the United States Army Corps of Engineers, expanding the island by raising lands previously submerged on the New Jersey side. *Id.* at 775–76, 783–84, 118 *S.Ct.* at 1732–33, 1737, 140 *L.Ed.*2d at 1008, 1013. New York and New Jersey had competing claims over portions of the newly created parts of Ellis Island. *Id.* at 778–80, 118 *S.Ct.* at 1734–35, 140 *L.Ed.*2d at 1010–11.

Applying the common-law doctrine of avulsion, the United States Supreme Court concluded that New Jersey maintained sovereignty over land submerged under the Hudson River abutting Ellis Island and therefore retained sovereignty to the land when it was raised and made part of the island. *Id.* at 781, 784, 118 *S.Ct.* at 1735, 1737, 140 *L.Ed.*2d at 1012–14. The Supreme Court noted that under the common law, the United States, the littoral owner of Ellis Island, could not extend its ownership of property into the New Jersey waters of the Hudson River by a landfill operation. *Id.* at 783, 118 *S.Ct.* at 1737, 140 *L.Ed.*2d at 1013. The Court stated: "We have long recognized that a sudden shoreline change known as avulsion (as distinct from accretion, or gradual change in configuration) 'has no effect on boundary,' and that this 'is the received rule of law of nations on this point, as laid down by all the writers of authority.'" *Id.* at 784, 118 *S.Ct.* at 1737, 140 *L.Ed.*2d at 1013 (internal citations and quotation marks omitted).

In summary, an avulsion is characterized by a rapid and significant (and therefore easily perceptible) change in the shoreline caused by natural or artificial means. The common-law doctrines of accretion, erosion, and avulsion have long been a part of New Jersey's jurisprudence. Owners of littoral property, the State, and the public have had reason to rely on those well-settled rules governing title to land that borders the sea. We will not undermine the stability of our carefully developed common law by now crafting a new set of rules of the game.

In deciding this case, we therefore rely on traditional common-law principles.

### C.

We reject the Lius' invitation that we disregard the common-law distinctions between accretion/erosion and avulsion and decide the case on the basis that *any* land added to the shoreline, either by natural or artificial means (other than by the upland owner), inures to the benefit of oceanfront property owners. We will not adopt, as the Lius request, a free-standing concept of "natural equity" as a basis for giving oceanfront owners an indefeasible right of direct contact with the water.[12] That approach is untethered to traditional common-law principles governing littoral property—in particular, the doctrine of avulsion—and would be contrary to the public trust doctrine. Moreover, the doctrine of avulsion itself is founded on principles of equity. Owners of oceanfront property do not lose land as a result of an avulsion because the former mean high water mark remains the demarcation line between their property and the public's property.

Moreover, natural equity is hardly a concept to be invoked by a property owner who is asking to be compensated in a condemnation action for new beachfront property created by a taxpayer-funded beach replenishment program. The primary purpose of

---

[12] The City does not suggest that there can be any impingement of the Lius' right of access to the sea.

the program is to protect the shoreline—public beaches and private beaches—from erosion. Logically, if the Army Corps of Engineers did not create more than two acres of new beach—extending the dry sand 225 feet seaward from the Lius' property—the natural process of erosion would have eaten away dry sand already enjoyed by the Lius. The beach replenishment program erected a buffer protecting the Lius' property, and therefore the Lius were a direct beneficiary of the work undertaken by the Army Corps of Engineers.[13] But the public benefits too because the prior mean high water mark results in approximately 225 feet of dry sand falling within the public trust doctrine.

We also do not share the concern expressed by the Lius that property ownership rights will become difficult to determine if the mean high water mark is not the dividing line between the respective interests of the upland owner and the State. Any purchaser of the Lius' property conducting a survey would have known that the dry beach had greatly expanded merely by referring to the Lius' 1977 deed, which describes in precise detail, by metes and bounds, the length of beach owned by the Lius: "North 88 degrees 55 minutes East along said South line 125 feet to the high water mark of the Atlantic Ocean." After the beach replenishment project, anyone reading the deed's description of the property would have known that the line extending to the high water mark was well in excess of 125 feet and that the beachfront property had increased by more than two acres. Significantly, title insurers should be acquainted with common-law principles that have governed for hundreds of years. *See* William E. Andersen, *Resolving State Title Claims to Tidelands: Practice and Procedure*, 168 *N.J. Lawyer*, Apr. 1995, at 8, 11, *available at* http://www.nj.gov/dep/landuse/literature.html (discussing title in-

---

[13] Notably, at oral argument, the City's attorney informed this Court that the approximately 225 feet of beach created by the Army Corps of Engineers was back under water. One can only surmise what would have been the damage to the Lius' property without the 225-foot buffer.

surance, including exceptions for "lands now or formerly flowed by the mean high tide").

In this case involving a recent beach replenishment project, the burden of establishing whether the beach increased by accretion or avulsion rested with the Lius—who were in the best position to know when and how the shoreline to their property changed. *See J.E. ex rel. G.E. v. State*, 131 *N.J.* 552, 569–70, 622 *A.*2d 227 (1993) ("We generally have imposed the burdens of persuasion and production on the party best able to satisfy those burdens. Our decisions have recognized that the party with greater expertise and access to relevant information should bear those evidentiary burdens." (internal citations omitted)); *cf.* 78 *Am.Jur.2d Waters* § 329 (2010) (stating that "in the absence of evidence to the contrary, the law will presume accretion rather than avulsion," but that presumption is rebuttable and does "not apply where the evidence sufficiently shows an avulsive change").[14] The Lius were not oblivious that the beach to their oceanfront property had been expanded by approximately 225 feet. The Lius argued that the 225 feet of extra beach—or at least part of that additional beach—was caused by accretion. The trial court found that the Lius did not carry their burden of showing that any portion of the 225 feet of new dry sand on their beach was a result of the imperceptible process of accretion. *Liu, supra*, 363 *N.J.Super.* at 413, 418, 833 *A.*2d 106. We see no basis to disturb the trial court's ruling.

We agree with the Law Division in this case that the rapid expansion of the Lius' shoreline by more than two acres over an approximately two-week period through a government-funded

---

[14] The Lius were operating businesses on the waterfront and were in the unique position to know if there were gradual or rapid changes to their beachfront. This case is therefore unlike *O'Neill, supra*, where the burden of showing a change to apparently unoccupied marshland dictated that "[p]ractical necessity requires that the burden of persuasion be placed upon whoever asserts a tideland status different from that which now appears." 50 *N.J.* at 326–27, 235 *A.*2d 1 (noting that "[i]n the past little attention was paid to the status of most of the marsh or meadow land, probably because their then values were relatively low").

beach replenishment project constitutes an avulsion. *See Liu, supra,* 363 *N.J.Super.* at 414, 416, 833 *A.2d* 106. That approach, using long-standing common-law principles, settles the matter because the newly created beach is land the State already owned and therefore falls within the public trust doctrine.[15] The people can enjoy the dry sand produced by the government-funded replenishment program for bathing and recreation, and the ocean-front owner can use the beach for those purposes as well. The City appears to concede that concession stands and other structures could not be erected on the new dry sand—held in trust for the public—that would interfere with the upland owners' enjoyment of their property. Thus, hot dog stands and other such commercial ventures—even by the City's reckoning—would be forbidden on the dry sand abutting the upland owners' property.

Last, we part with the Appellate Division, which declined to apply the doctrines of avulsion and accretion and instead decided the case on public policy grounds. The appellate panel merely concluded that the Lius should not reap the monetary benefit of a government-funded beach "restoration project that increased the area of dry land on the beach." However, that approach, taken to its logical extreme, would impliedly repeal our decision in *Masciarella, supra,* which allows the upland owner the benefit of a beach replenishment project in which dry sand is added by means of accretion. 51 *N.J.* at 357, 359, 240 *A.2d* 665 (holding that littoral owner can gain property through accretion even if accretion is caused by artificial means). A point overlooked, perhaps, by the panel is that the common-law doctrines of accretion and

---

15 The Lius, for the first time, in a brief responding to arguments raised by amici, suggested that one avulsion, the gain of land from the beach replenishment project, merely neutralized a prior avulsion, the loss from an earlier winter storm. The unproven premise to that argument is that the Lius' property had already expanded 225 feet due to accretion. By their reckoning, the beach replenishment returned the parties to the status quo ante. Those facts were not developed in this record. We generally will not consider the legal significance of facts that are not before us and were not before the trial court. *See Cipala v. Lincoln Technical Inst.,* 179 *N.J.* 45, 52, 843 *A.2d* 1069 (2004); *R.* 2:5–4.

avulsion reflect public policy. *See Vasquez v. Glassboro Serv. Ass'n, Inc.,* 83 *N.J.* 86, 98, 415 *A.*2d 1156 (1980) ("The sources of public policy include federal and state legislation and judicial decisions.").

In the end, under the public trust doctrine, the people of New Jersey are the beneficiaries of the lengthening of the dry beach created by this government-funded program. Because the old mean high water mark remains the boundary line between private and public property, there was no true loss of land to the Lius or gain to the State. In the context of this eminent domain action, the Lius cannot be recompensed for the taking of property they never owned. Therefore, the trial court properly denied the Lius' motion to amend the City's complaint describing the Lius' property as set forth in the 1977 deed.

## IV.

We next turn to the Lius' argument that the trial court erred in denying their motion for a new trial after the jury in the condemnation action failed to award them any compensation for the furnishings, fixtures, and equipment (FF & E) in several commercial establishments on their boardwalk property. We begin with the evidence presented to the jury.

## A.

At the trial, the City of Long Branch presented an appraiser, Hugh A. McGuire Jr., who testified that the fair market value of the Lius' property was $927,000 as of May 14, 2001, the date the City filed its condemnation complaint. McGuire included in that appraisal figure the value of the property's furnishings, fixtures, and equipment because he compared the value of the Lius' property to that of other restaurants, which were sold with their equipment. McGuire also testified that the contents of a restaurant, such as plates, silverware, and cash registers, would not all constitute a functional unit within a building condemned through eminent domain. In addition, the City submitted the report of

Peter Costanzo, an expert on the appraisal of furnishings, fixtures, and equipment, who valued the Lius' FF & E at $19,200.[16]

The Lius called as their expert FF & E appraiser Tadeusz Harski, who valued the contents of the Lius' restaurants at $176,400. Harski classified as FF & E such items as cutlery, cash registers, coffeemakers, plates, pots, signs, furniture, flower holders, a sound system, televisions, bar equipment, sinks, counters, grills, ovens, refrigerators, freezers, and a walk-in cooler. He testified that the FF & E formed functional units in the restaurants located in the condemned building. Harski, however, made no distinction whether the items were "moveable or non-moveable," nor did he value the building with or without the FF & E. Also testifying for the Lius was Dr. Donald Moliver, an expert property appraiser, who stated that the fair market value of the boardwalk property—with $175,000 of FF & E—was $2,855,000.

In addition to examining pictures of the Lius' building, the jury viewed a videotaped walkthrough of the property.[17] The video was taken about two months after the Lius moved from the building. At the time of the video, the windows were boarded up, broken glass was on the ground, items appeared to have been removed, and there was evidence of vandalism. John Lombardo, who was involved in the redevelopment project and had managed the hotel next door, conducted and narrated the videotaped walkthrough of the building. He testified that, aside from the broken glass and some missing equipment, the video accurately depicted the physical condition of the property before the Lius' move. The jury also viewed numerous color photographs of the furnishings, fixtures, and equipment submitted by the Lius.

In its verdict, the jury determined that a fair and just value of the Lius' property, as of May 14, 2001, was $1,450,000. On the

---

[16] The parties agreed to enter into evidence the report of Costanzo, who was unavailable to testify.

[17] The Lius objected to the introduction of the videotape.

verdict sheet, the jury stated that "the building on the Liu property and the various [FF & E] therein form a single functional unit." On the same verdict sheet, the jury answered that "a reasonably willing purchaser of the Liu property" would not "pay substantially more for that property with the equipment ('FF & E') in place." Based on those answers, the jury awarded the Lius no compensation for the FF & E.

The Lius moved for a new trial or additur, claiming that the jury's failure to award compensation for the FF & E was against the weight of the evidence. The Lius also claimed that the erroneous admission of the videotape denied them a fair trial. The trial court denied the motion, characterizing the case as a battle of the experts in which the jury had the final say. The court found nothing in the jury's award that was "plainly wrong or shocking to the conscience."

## B.

The Appellate Division affirmed the trial court's denial of the Lius' new-trial motion. The appellate panel declined to "second guess" the jury's verdict that a reasonably willing purchaser would not have paid substantially more for the property with the FF & E in place. It found that the jury was "properly instructed on the principles underlying an award for FF & E [and] rejected [the Lius'] position." The panel implied that the FF & E issue need not have been submitted to the jury. That is because the panel held, as a matter of law, that the items offered by the Lius as FF & E did not "constitute a single functional unit" with the premises. (Citing *Town of Montclair v. D'Andrea*, 138 *N.J.Super.* 479, 351 *A.*2d 397 (App.Div.1976)).

Although the panel expressed uncertainty concerning the relevancy of the video, it concluded that the trial court did not abuse its discretion in admitting the video into evidence. Last, the panel noted that the Lius could not have suffered prejudice from the admission of the video because, in any event, the evidence did not support an award for FF & E.

## C.

We granted the Lius' petition for certification, *City of Long Branch v. Liu,* 200 *N.J.* 211, 976 *A.*2d 387 (2009), to review their claim that the jury's verdict, which made no award for the FF & E, was against the weight of the evidence.[18] The Lius also contend in their petition that the Appellate Division erred in concluding, as a matter of law, that the FF & E was not compensable and, therefore, erred in using that mistaken legal determination as the basis for finding that the admission of the "irrelevant" videotape was not prejudicial.

## V.

We first address whether the jury's verdict in not awarding any value for the FF & E was against the weight of the evidence. Significantly, the Lius do not challenge the trial court's charge to the jury explaining how to determine whether FF & E was compensable in the condemnation action. Nor do the Lius challenge the validity of *State v. Gallant,* 42 *N.J.* 583, 202 *A.*2d 401 (1964), which was the basis for the court's charge on the subject of valuing FF & E. *See Model Jury Charge (Civil)* § 9.13 (Condemnation—Machinery) (April 1996). Rather, the Lius contend that, in light of the court's instructions, the jury came to the wrong result.

No one disputes that furnishings, fixtures, and equipment that are a functional unit of a building condemned in an eminent domain action are compensable. Article I, Paragraph 20 of the New Jersey Constitution provides: "Private property shall not be taken for public use without just compensation." *See also U.S. Const.* amend. V ("[N]or shall private property be taken for public use, without just compensation."). The guidelines for establishing the compensability of FF & E were set forth in *Gallant, supra,* 42 *N.J.* at 590, 202 *A.*2d 401. In that eminent domain case, a building

---

[18] Our grant of certification in this case covered both the beach-ownership and FF & E issues. As noted earlier, we have dealt with these issues separately for the sake of clarity.

containing a fabric weaving business was condemned to make way for a highway. *Id.* at 584–85, 202 *A.*2d 401. The factory had twelve looms that had operated continuously for more than forty years at the site. *Id.* at 585, 202 *A.*2d 401. Each loom on average weighed 8000 pounds, and each one was bolted to the floor. *Ibid.* The value of the looms at the condemned building was $52,000, and the cost of dismantling, moving, and reassembling them was $39,600. *Id.* at 586, 202 *A.*2d 401.

We recognized in *Gallant* that "[t]he value of a factory containing industrial equipment employed in the business for which the property is being used is ordinarily greater than that of an empty and idle building" and that "[a]n owner, who is under no duress, and *where the building and machinery are a functional unit,* would undoubtedly sell only at a price which would reflect that increased value." *Id.* at 590, 202 *A.*2d 401 (emphasis added). We held that where industrial machinery constitutes "a functional unit" in a condemned building and "the difference between the value of the building with such articles and without them [ ] is substantial, compensation for the taking should reflect that enhanced value." *Ibid.* We remanded to the trial court to apply those principles.[19] *Id.* at 591, 202 *A.*2d 401.

Consistent with *Gallant,* and *Model Jury Charge (Civil)* § 9.13 (Condemnation - Machinery) (April 1996), the trial court in this case instructed the jury, in relevant part, that

---

[19] The Eminent Domain Act also defines "property" in a way that encompasses certain furnishing, fixtures, and equipment. *See N.J.S.A.* 20:3–2(d). The Lius have not argued that the statutory definition of "property" provides an alternative grounds for compensation for their FF & E distinct from the *Gallant* standard. The jury in this case received the *Gallant*-based *Model Jury Charge (Civil)* § 9.13 (Condemnation - Machinery) (April 1996), and in oral argument, defense counsel conceded that the jury was properly charged on the law. To the extent that the owners have raised *N.J.S.A.* 20:3–2(d), it has been to argue that the statute cannot abridge the constitutionally based test for "just compensation" set forth in *Gallant. See Hous. Auth. of Clementon v. Myers,* 115 *N.J.Super.* 467, 479, 280 *A.*2d 216 (App.Div.1971) ("The Legislature cannot in any event constitutionally mandate the payment of less than 'just compensation' as the courts determine that to be.").

[t]he test for compensation as to the various furnishings, fixtures and equipment is not their removability but rather if the building and the items in question constitute a functional unit and whether a reasonably willing purchaser would pay substantially more for the building with such articles included than he would without them.

If the building and the [FF & E] are meant to be used together, then the law recognizes the loss involved in separating them. The test that you must apply is whether the [FF & E] and the building form a single functional unit.

Do the [FF & E] form an integral and valuable part of the going business? If it does and if the value of the building is substantially enhanced by the [FF & E], the property owner should be paid for that value.

Thus charged, the jury, as the finder of fact, had the responsibility to determine not only whether the FF & E formed a functional unit with the Lius' building, but also whether the value of the building was substantially enhanced by the FF & E. The jury was free to find that the pots and pans, coffeemaker, utensils and like items did not form a functional unit with the building. The jury was free to conclude, as it did, that at least some of the FF & E formed a single functional unit with the building and was equally free to conclude that a reasonably willing purchaser would not have paid "substantially more for that property with the" FF & E.

The jury rendered its verdict after several weeks of trial, after reviewing all of the evidence, and after hearing from the City's and the Lius' appraisers. The jury was not required to accept that every item of FF & E presented by the Lius formed a functional unit with the building or that the Lius' experts' valuations of the FF & E and property were correct. The jury had before it competing valuations. It is the unique role of the jury to assess the credibility of the witnesses and the weight to be given to their testimony. Expert testimony is treated no differently, and indeed the jury was instructed that it was not bound to accept an expert's opinion in whole or even in part. *See State Highway Comm'n v. Mayor of Dover*, 109 *N.J.L.* 303, 307, 162 *A.* 749 (E. & A.1932) ("Expert testimony is not necessarily binding upon the jury. The jury may adopt so much of it as appears sound, reject all of it, or adopt all of it."); *State v. Interpace Corp.*, 130

*N.J.Super.* 322, 332, 327 *A*.2d 225 (App.Div.1974) ("In determining valuation [in a condemnation action] the jury is under no obligation to accept an expert's opinion....").

It is obvious that the jury made an independent calculation of the value of the Lius' property ($1,450,000), rejecting the appraisals given by both the City's expert ($927,000) and the Lius' expert ($2,680,000 without the FF & E). Our civil jury system places in ordinary citizens of varying experiences and backgrounds the responsibility of determining just compensation in a condemnation action. *Cf. Johnson v. Scaccetti,* 192 *N.J.* 256, 279, 927 *A*.2d 1269 (2007). A jury verdict, although not sacrosanct, is entitled to great deference. A motion for a new trial or, alternatively, an additur, based on a claim that a jury award was against the weight of the evidence, should not be granted unless it "clearly and convincingly appears" that the award was so deficient that it constitutes a "miscarriage of justice." *See Baxter v. Fairmont Food Co.,* 74 *N.J.* 588, 596, 379 *A*.2d 225 (1977) (quoting *R.* 4:49–1(a)).

In deciding whether a verdict is against the weight of the evidence, the trial judge "may not substitute his judgment for that of the jury merely because he would have reached the opposite conclusion." *See Dolson v. Anastasia,* 55 *N.J.* 2, 6, 258 *A*.2d 706 (1969). An appellate court's review of a trial court's ruling on such a motion for a new trial is similarly limited. *See Jastram v. Kruse,* 197 *N.J.* 216, 230, 962 *A*.2d 503 (2008) (noting that appellate "inquiry requires employing a standard of review substantially similar to that used at the trial level, except that the appellate court must afford due deference to the trial court's feel of the case" (citation and internal quotation marks omitted)); *Dolson, supra,* 55 *N.J.* at 7, 258 *A*.2d 706. On a new-trial motion, after a six-person jury has returned a verdict, the judge does not sit as a seventh juror, and, on appeal, this Court does not sit as the juror of last resort.

By the standard described, the trial court did not err in denying the Lius' motion for a new trial. The jury, which had the

opportunity "to pass upon the credibility of the witnesses," *see R.* 4:49–1(a), had a sufficient basis to render a verdict that a reasonably willing purchaser would not have paid more for the Lius' property with the FF & E in place.

■ Finally, we make two observations. First, the Appellate Division mistakenly concluded that, as a matter of law, *all* the FF & E in the Lius' building did not constitute a single functional unit.[20] That error is of no moment because the trial court properly presented the factual dispute to the jury. Second, we need not discuss whether the trial court abused its discretion in admitting the videotape taken of the interior of the Lius' building two months after the Lius had vacated the premises. *See Estate of Hanges v. Metro. Prop. & Cas. Ins. Co.*, 202 *N.J.* 369, 997 *A.*2d 954 (2010) ("Evidentiary decisions are reviewed under the abuse of discretion standard because, from its genesis, the decision to admit or exclude evidence is one firmly entrusted to the trial court's discretion."). Testimony was presented by those knowledgeable of the contents of the Lius' building, and the Lius had the opportunity to cross-examine a witness about the videotape and generally discredit the accuracy of its depictions. The Lius also presented their own photographs of the building and its furnishings, fixtures, and equipment. However limited the probative value of the videotape, we cannot conclude that its admission prejudiced the fairness of the trial or was "clearly capable of producing an unjust result." *See R.* 2:10–2.

## VI.

In summary, in this eminent domain action, the trial court properly determined that the expanded dry beach (previously tidally flowed) that was produced by the government-funded beach replenishment program fell within the public trust doctrine and

---

[20] We do not suggest that a number of items on the Lius' list of FF & E—such as cutlery—would, under any circumstances, form a functional unit with a building.

was not the property of the upland owners, the Lius. Therefore, the Lius were not entitled to compensation for property they did not own. In addition, the jury determination that a reasonably willing purchaser would not have paid substantially more for the property with the furnishings, fixtures, and equipment was not a miscarriage of justice. We reject the Lius' contention that they did not receive just compensation for their property. For the reasons given, we affirm the judgment of the Appellate Division.

*For affirmance*—Chief Justice RABNER and Justices LONG, LaVECCHIA, ALBIN, WALLACE, RIVERA–SOTO and HOENS—7.